# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00431-CV

**Appellants, Alon USA, LP and Alon USA GP, Inc.//Cross-Appellant, The State of Texas**

**v.**

**Appellee, The State of Texas//Cross-Appellees, Alon USA, LP and Alon USA GP, Inc.**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. GV102519, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

Appellants, Alon USA, LP and Alon USA GP, appeal from the trial court's judgment awarding the State of Texas damages for unpaid motor fuel taxes for the months of December 2000 and January 2001. The lawsuit involved unpaid fuel taxes for the months of September, October, and December 2000, and January 2001. Appellee, the State of Texas, cross-appeals the trial court's denial of damages for the first two months at issue. We will affirm that part of the trial court judgment awarding damages to the State for the months of December 2000 and January 2001, and reverse and render judgment awarding damages to the State for the months of September and October 2000.

## I. BACKGROUND

Although Alon USA LP, Alon USA GP, Inc. (collectively Alon), and the State of Texas are the only parties to the lawsuit, several actors were involved in the transactions giving rise

to the suit. Appellant Alon USA, LP is a Texas limited partnership in the business of refining and selling motor fuel in the state of Texas under the Fina brand. It also provides credit card processing and collection services to gas stations operating under the Fina brand. Appellant Alon USA GP, Inc., is a Texas corporation and Alon's general partner. Vista Stores LLC ("Vista") is a Texas limited partnership that leased fifty-three gas stations in the Dallas/Fort Worth Metroplex area, selling motor fuel under the Fina brand. Vista was the parent company of Akard Street Fuels LP ("Akard"), a Texas limited partnership engaged in the business of buying motor fuel from Alon for resale to Vista.

During the liability period, Alon had a dual role, acting both as a gasoline distributor and a provider of credit card processing and collection services. Alon, Vista, and Akard followed a business model where Akard would buy tax-free gasoline from Alon on credit and resell to Vista on a tax-paid basis. Alon provided credit card processing services to Vista and, as a result, would owe Vista money every time a customer paid with a credit card at a Vista gas station. Alon thus had a right to receive payment from Akard for Akard's purchases of fuel and Vista had a right to receive payment for Alon for credit card purchases at Vista gas stations. Instead of forwarding these credit card payments to Vista and demanding payment from Akard, Alon adopted the practice of setting off these payments against each other. Instead of paying Vista, it would issue credit memos against Akard's fuel debt. After Vista and Akard declared bankruptcy, the State sued Alon for payment of Akard's past due gasoline taxes. A full understanding of the transactions and the basis for the lawsuit requires a chronological depiction of the facts.

The facts in this case are not in dispute. In December 1998, Vista acquired leasehold interests in fifty-three Fina branded convenience store gas stations from FinaServe, Inc., a subsidiary

2

of Fina.  Vista and Fina also entered into a Branded Contract, requiring Vista to purchase gasoline exclusively from Fina and operate the gas stations under the Fina logo and trademark.  The contract also required Vista to purchase at least 5,000,000 gallons of gasoline each month.  Fina, through its bundle of equipment and services known as FinaNet, would provide Vista with credit card acceptance, authorization, and other services necessary to accept payments by credit card.  Fina also offered Vista customers its own private label credit card ("Fina card").  Customers at Vista gas stations could use their Fina Cards or any other major credit card ("bank cards").  The Branded Contract also established that Fina would provide credit card collection services to Vista for a fee, and that all of Vista's credit card sales would be transferred and assigned to Fina.  As a result, under the Branded Contract, Fina operated both as Vista's exclusive supplier of gasoline and Vista's sole provider of credit card services.

Under this arrangement, Vista operated as a "Dealer," the "operator of a service station or other retail outlet and who delivers motor fuel into the fuel supply tanks of motor vehicles or motorboats." Tex. Tax Code Ann. § 153.001(4).[1]  Fina operated as a "Distributor," a person who "regularly makes sales or distributions of gasoline that are not into the fuel supply tanks of motor vehicles, motorboats, or aircraft." *Id*. § 153.001(9)(a).  A distributor must obtain a distributor's permit. *Id*. § 153.107.  A tax of 20 cents per gallon is imposed on the first sale or use of gasoline.

---

[1]  The motor fuels chapter of the Texas Tax Code, Chapter 153, in effect during the events at issue in this appeal, was repealed effective December 31, 2003. *See* Act of June 10, 2003, 78th Leg., R.S., ch. 199, § 1, 2003 Tex. Gen. Laws 199 (enacting new Chapter 162 of the Tax Code pertaining to motor fuel taxes).  The tax collection scheme giving rise to the events at issue in this case was replaced by a system requiring tax collection at the terminal rack. *See*, *e.g.*, § 162.101 of the new motor fuel tax provision.  For purposes of convenience, we will refer to the former Chapter 153 as "Tax Code § 153__."

*Id*. §§ 153.101(a), 153.102(a). A distributor is exempt from collecting the gasoline tax when it sells to another distributor, but must include the tax when it sells to dealers. *Id*. §§ 153.104(3). As a result, all sales of gasoline from Fina (the distributor) to Vista (the dealer) had to be executed on a tax-paid basis, with Fina charging Vista the gasoline tax at the statutory rate of 20 cents per gallon. The tax would ultimately be passed on to the consumer, as Vista charged the state gasoline tax at the pump. Because gasoline was sold on a tax-paid basis, Fina was responsible for remitting the appropriate gasoline tax to the taxing authority.[2]

Although the Branded Contract required Fina to provide Vista with credit card collection services for a fee, in practice Vista's credit card revenues were used as a credit against Vista's liability for gasoline purchases. Fina would provide Vista with bi-weekly statements, showing matured credit card receipts of Vista's sales of gasoline and non-gasoline items as a credit against Vista's gasoline purchases.[3]

---

[2] For illustration purposes only, we will assume that Fina sold gasoline at $1 per gallon. Since Fina and Vista transacted on a tax-paid basis, Fina would add the gasoline tax to the price, charging Vista $1.20 per gallon. If Vista ordered 100 gallons, it would owe Fina $120.

[3] We will build upon the previous example in which Vista purchased 100 gallons of gasoline from Fina for $1.20 per gallon on a tax-paid basis incurring $120 in liability to Fina. Assuming Vista's price structure included only an additional $.10 per gallon to cover operational costs and profit, Vista would charge its customers $1.30 per gallon. If a customer purchased 50 gallons of gasoline at $1.30 per gallon charging the whole purchase on her Fina credit card, for a total of $65, Fina would simply show a $65 entry on its bi-weekly statement to Vista and credit the whole $65 amount against Vista's gasoline liability. At the end of the transaction, Fina's books would show Vista's liability at $55, with its original liability of $120 reduced by the $65 credit. It is worthy of notice that, in this process, Fina credited Vista's fuel liability, which consisted only of the cost of fuel plus the gasoline tax ($60 for the 50 gallons purchased by the customer), with the full amount charged by Vista to its customers, which included not only the cost of fuel and gasoline tax, but also the amount added by Vista to cover its operating costs and profit ($65). If the customer, in addition to purchasing gasoline, had also purchased other items at Vista's convenience stores, the total purchase would be credited to Vista's fuel liability, even though it included non-gasoline items. Not

4

The distributor making the first taxable sale or use of the gasoline is allowed to retain the tax on two percent of the taxable gallons of gasoline it sells to compensate it "for the expenses of collecting, accounting for, reporting, and remitting the tax collected and for keeping records." Tax Code § 153.105(e). The distributor makes money not only by keeping the two percent statutory discount but also by retaining the amount it receives from dealers for 25-55 days until it must remit the tax to the Comptroller on the 25th of the following month. *See id*. § 153.118. However, a distributor cannot simultaneously operate as a dealer. *Id*. § 153.001(9)(A). In order to take advantage of the statutory discounts and payment schedules allowed distributors, Vista created its own distributor, Akard. Akard obtained a distributor's permit enabling it to buy gasoline from Fina on a tax-free basis, effective July 1, 1999. Fina's contract was only with Vista; Fina was under no obligation to sell gasoline to Akard. However, Fina started to sell gasoline to Akard on a tax-free basis. Fina ceased to include the gasoline tax on its price to Akard but continued to apply Vista's credit card revenues as a credit to Akard's liability for gasoline purchases. Fina also continued to provide Vista with bi-weekly statements, showing matured credit card receipts of Vista's sales of gasoline and non-gasoline items as a credit against Akard's gasoline purchases.[4]

---

surprisingly, Vista operations were never consistently profitable. Since Fina was the party ultimately responsible for remitting the appropriate gasoline tax to the taxing authority, these tax-paid transactions are not the basis for the issues presented in this case.

[4] As a hypothetical transaction, we will assume Akard purchased 100 gallons of gasoline from Fina for $1.00 per gallon on a tax-free basis incurring $100 in liability to Fina. Akard then added the $.20 per gallon to the gasoline price and passed it on to Vista at $1.20 per gallon. Assuming Vista's price structure included only an additional $.10 per gallon to cover operational costs and profit, Vista would charge its customers $1.30 per gallon. If a customer purchased 50 gallons of gasoline at $1.30 per gallon charging the whole purchase on her Fina credit card, for a total of $65, Fina would credit the whole $65 amount against Akard's gasoline liability, even though Akard's liability consisted only of the gasoline cost. At the end of the transaction, Fina's books

5

Akard basically operated as a vehicle to allow Vista to purchase gasoline tax-free from Fina. Akard purchased gasoline exclusively from Fina and sold it exclusively to Vista. Akard's accounting results were consolidated with those of Vista, its only "customer." Akard did have a separate banking identity, but its bank account was a zero balance account linked to Vista's so that every payment item was covered by funds pulled from Vista's account. In substance, Fina treated Akard as the same entity as Vista and did not modify its Branded Contract to include Akard. It simply considered Akard as a name change, often referring to the new company as "Akard/Vista".

In August 2000, Alon acquired Fina's distributor network in Texas, Oklahoma, and New Mexico, along with Fina's refinery in Big Spring, Texas and Fina's pipeline network in these states. As a result of the acquisition, Fina conveyed its interest in the Branded Contract to Alon.

Alon was under no obligation to continue to sell gasoline to Akard since the Branded Contract was only between Vista and Alon, as Fina's successor in interest. However, Alon chose to continue Fina's practice of selling gasoline to Akard on a tax-free basis and applying Vista's credit card revenues as a credit to Akard's liability for gasoline purchases. Alon, as Fina did before it, provided Vista with bi-weekly statements, showing matured credit card receipts of Vista's sales of gasoline and non-gasoline items as a credit against Akard's gasoline purchases.[5]

---

would show Akard's liability at $35, with its original liability of $100 reduced by the $65 credit. Akard, as the distributor, would keep its statutory discount of two percent and owe the taxing authority $18 in taxes. Assuming another customer purchased 10 gallons of gasoline from Vista at $1.30 per gallon and also $20 in convenience store goods, charging a total of $33 on his credit card, Fina would credit the whole $33 amount to Akard's fuel account.

[5] Alon advanced gasoline credit to Akard in the amount of the total credit card charge effectuated by the customer at a Vista convenience store gas station, less processing charges, by issuing a credit memo against receivables due from Akard. However, the amount customers charged on their credit cards at Vista stations was necessarily greater than Akard's tax-free gasoline purchases

In August 2000, Akard started having difficulties paying its gasoline tax obligations. As of December 6, 2000, it owed the state $2.5 million in gasoline tax, representing past due taxes for August, September, and October 2000. On this date, Alon's credit manager notified Vista by e-mail that he was aware of the tax deficiency. At the time, Alon was holding $432,000 as a cash deposit to cover future fuel purchases. The deposit was created by withholding credit card credits due Vista.[6] As of January 5, 2001, the cash deposit had increased to $659,000 and Alon intended to continue withholding credit card credits due Vista until the security deposit totaled $1 million. As of January 25, 2001, the security deposit had increased to approximately $880,000, and to over $900,000 as of February 9, 2001. On February 9, 2001, Vista sued Alon for a temporary restraining order to allow Vista to use the deposit to buy gasoline. The temporary restraining order was granted, allowing Vista to charge gasoline purchases against the deposit, up to $942,783. Akard took

---

from Alon, because Vista passed on to the customer the $.20 per gallon gasoline tax, Vista's operational costs and Vista's profit. Customer charges also included credit card purchases of non-gasoline items at Vista's convenience stores. As an example, assume a customer purchased 10 gallons of gasoline at $1.30 per gallon plus $30 in cigarettes for a total credit card charge of $43. Within 2 days of that charge, Alon would advance to Akard the $43 in gasoline credit minus Alon's processing fee. When the customer finally paid her $43 credit card bill, the financial institution would remit the whole $43 to Alon because, under the Branded Contract, Vista credit card sales were transferred and assigned to Fina and, thus, to Alon as Fina's successor in interest.

[6] One of the conditions Fina originally imposed on Vista, in order to secure credit for fuel purchases, was a deposit of $200,000 in an escrow account. Alon continued this practice. This was not a separate bank account but just an escrow account on Alon's books. Alon, however, gradually increased the required deposit by continuously withholding Vista's credit card receipts. This ever-increasing escrow account reached $919,315 in February 2001, when Vista sued Alon and obtained a temporary restraining order allowing Akard to have gasoline purchases credited against this amount. Akard subsequently drew down on the escrow account by making gasoline purchases until it had a zero balance.

advantage of the temporary restraining order before it was dissolved the following week, pulling $770,000 in fuel. Alon applied the remainder of the deposit to Akard's account.

The Comptroller suspended Akard's distributor's permit on February 2, 2001. At the time, Akard owed the state past due taxes for the months of September, October, and December 2000, and January 2001 ("the liability period").

The State of Texas sued Alon under three theories of liability: (1) as a statutory trustee under section 111.016(a) of the Texas Tax Code for receiving or collecting a tax or money represented to be a tax in the form of credit card payments at gasoline outlets operated by Vista during the liability period; (2) as a tortfeasor in the conversion of trust funds; and (3) as a tortfeasor for breach of fiduciary duty regarding trust funds. The trial court awarded judgment for the State in the amount of $548,129.88, representing gasoline tax received or collected by Alon on credit card sales transactions occurring in the months of December 2000 and January 2001 at the Vista gas stations, together with statutory penalty and interest, plus court costs and $50,000 in attorney's fees. The court denied recovery for the months of September and October 2000. Alon appeals the trial court's award. The State cross-appeals the trial court's denial of recovery for the months of September and October 2000.

## II. DISCUSSION

Alon presents seven issues on appeal: (1) Alon could not be liable as a statutory trustee because it never received or collected a tax or money represented to be a tax pursuant to Tax Code section 111.016(a); (2) even if Alon received or collected a tax or money represented to be a tax, there is no evidence of the actual amount of taxes collected; (3) the opinion testimony and report

8

of the State's damages expert are unreliable and inadmissible as a matter of law, and therefore, are no evidence of damages; (4) there is no "transfer" of trust property in the Fina card transactions and, as a result, the trial court erred as a matter of law in finding that a "wrongful transfer" has occurred; (5) there is no "wrongful transfer" as a matter of law in the context of bank card transactions; (6) there is no evidence of damages because the State's damages evidence does not distinguish between bank card and Fina card transactions; and (7) the only month in which Alon even arguably had reason to believe Akard was not paying its gasoline tax was January 2001 and, as a result, in the alternative, Alon is entitled to a remittitur of $340,037.35 plus penalty and interest.

## A. Liability as a Statutory Trustee

### 1. Receiving or collecting a tax or money represented to be a tax

Alon argues that it was not a statutory trustee because it never received or collected a tax or money represented to be a tax:

> Any person who receives or collects a tax or any money represented to be a tax from another person holds the amount so collected in trust for the benefit of the state and is liable to the state for the full amount collected plus any accrued penalties and interest on the amount collected.

Tex. Tax Code Ann. § 111.016(a) (West 2002).

Alon contends that the application of section 111.016(a) to Alon or other third-party credit card processors does not fall within the letter of the statute and flies in the face of proper statutory construction. Matters of statutory construction are questions of law, subject to review *de novo*. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 238 (Tex. 1992). "In

9

interpreting a statute, a court shall diligently attempt to ascertain legislative intent and shall consider at all times the old law, the evil, and the remedy." Tex. Gov't Code Ann. § 312.005 (West 2002). The starting point is to look to the plain and common meaning of the statute's words, viewing its terms in context and giving them full effect. *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998). Because canons of statutory construction may be cited to support conflicting interpretations of a disputed statute, we must also consider the good sense of the situation, using a simple construction of the available language. *Gables Realty L.P. v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex. App.—Austin 2002, pet. denied). We consider a statute as a whole and do not consider its provisions in isolation. *Continental Cas. Ins. Co. v. Downs*, 81 S.W.3d 803, 805 (Tex. 2001); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001). Statutes imposing a tax must be strictly construed against the taxing authority and liberally construed in favor of the taxpayer. *Gables Realty L.P.*, 81 S.W.3d at 872.

The trust language of section 111.016(a), added effective July 21, 1987, clarified the status of collected gasoline tax receipts because the Texas Tax Code provisions dealing in general with the collection of gasoline taxes do not contain trust fund language. *See*, *e.g.*, Tax Code § 153.105 (imposing an obligation on any person making a sale or use of gasoline on which the tax has not been previously paid to add the tax to the selling price and collect it from the purchaser). The legislative intent in enacting section 111.016(a) was thus to make clear that collected taxes, including gasoline taxes, are trust funds. The tax was initially imposed to generate funds for the state's use, and thus the state is the beneficiary of the tax, not the distributor, the dealer, or other parties in the supply chain that act as the intermediary sales tax collectors.

10

The gasoline tax statute recognizes that, although multiple actors may be involved in the supply chain, the consumer is ultimately responsible for paying the tax, as expressly stated in section 153.105(a):

> In each subsequent sale of gasoline on which the tax has been collected, the amount of the tax shall be added to the selling price so that the tax is paid ultimately by the person using or consuming the gasoline for the purpose of propelling a vehicle upon the public highways of this state.

Tax Code § 153.105(a) (West 2002).

Reading sections 111.016 and 153.105(a) together, when a consumer pays for gasoline purchased for the purpose of propelling a vehicle upon the public highways of this state, the selling price includes the gasoline tax and any person who receives or collects that payment from the consumer holds the amount so collected in trust for the benefit of the state and is liable to the state for the full amount of gasoline tax collected plus any accrued penalties and interest on the amount of gasoline tax collected.

A distributor can sell to another distributor on a tax-free basis but must include the tax when selling to a dealer. Tax Code § 153.104(3). Akard (the distributor) purchased gasoline tax-free from Alon (in its role as a distributor). Vista (the dealer) purchased gasoline from Akard (the distributor) on a tax-paid basis and then added the gasoline tax to the price it charged consumers at the pump, as required by section 153.105(a). The gasoline selling price thus had two components, the cost of the gasoline and the gasoline tax. When a consumer pays for gasoline with cash, the amount paid consists of these same two components, the cost of the gasoline and the gasoline tax. When Vista receives the cash payment from the consumer, it holds the amount corresponding to the

11

gasoline tax in trust for the benefit of the state and is liable to the state for the gasoline tax amount collected plus any accrued penalties and interest.

When a consumer pays for gasoline by charging the selling price on a credit card, the amount charged consists of the same two components as in a cash transaction, the cost of the gasoline and the gasoline tax. The total charge the consumer later sees in his credit card bill, even if listed as a consolidated amount, is still comprised of the cost of the gasoline and the gasoline tax. When the consumer pays his credit card bill, the amount paid for the gasoline purchase contains the same two components. Just like the dealer in a cash transaction, when the credit card provider receives the payment from the consumer, it holds the amount corresponding to the gasoline tax in trust for the benefit of the state.

In our case, Alon had a dual role, operating not only as Akard's gasoline distributor but also as Vista's credit card processing and collection services provider. As a result, Alon, through its financial network known as FinaNet, would ultimately receive the consumers' payments for credit card purchases at Vista gas stations. The amount corresponding to the gasoline tax would constitute trust funds for the benefit of the State.

Alon argues that these credit card transactions did not constitute trust funds because (1) Alon was liable to Vista for credit card purchases at Vista stations regardless of whether or not the consumer actually paid his credit card bill and (2) Alon, under the Branded Contract, owed Vista only days after the purchase, long before Alon ultimately collected from the consumer. However, when the credit card provider assumes the responsibility to pay the dealer before it collects from the consumer, as Alon did in this case, the amount owed to the dealer that corresponds to the gasoline

12

tax constitutes trust funds for the benefit of the state, even if it will only later be collected from the consumer.[7]

## 2. Setoff as a defense to liability as a statutory trustee

Alon argues that it never collected any taxes because, when a consumer paid his credit card bill for gas purchases charged on a credit card at a Vista gas station,[8] Alon (in its role as a credit card provider) had already "prepaid" Vista (the dealer) the amount charged by issuing a credit memo against Akard's (the distributor) trade debt to Alon (in its role as a distributor) for gasoline purchases. Alon asserts that, as a result, even if any trust funds were involved, they would have been fully transferred to Akard by means of the setoff. The question we must resolve is thus whether the credit memo issued against Akard's account relieved Alon of liability for the taxes collected through the credit card receivables.

In order to determine whether Alon's credit memos issued against Akard's account constituted a proper setoff we must consider (a) the mutuality of obligations and (b) the trust fund nature of the funds.

---

[7] Alon also argues that, since it offset Akard's liability against payments due to Vista regardless of whether the customer paid its credit card charges, the funds in question cannot constitute trust funds. This argument is inapplicable in this case, since the State only sought to recover funds actually collected by Alon from Vista customers and the expert calculations contain deductions for uncollected amounts.

[8] Customers charged their purchases at Vista gas stations using the Fina card and bank cards. However, under the Branded Contract, all of Vista's credit card sales were assigned to Alon and there is no difference, for the purposes of this analysis, whether customers used a Fina card or a bank card.

### (a) The Mutuality of Obligations

A claim of right to withhold payment and apply it against a debt has traditionally been treated as a setoff. *United States v. Isthmian S.S. Co.*, 359 U.S. 314, 318 (1959) (superseded by statute on other grounds as stated in *Hornbeck Offshore Operators v. Ocean Line*, 849 F. Supp. 434, 449 (E.D. Va. 1994)). However, in order for one demand to be set off against another, both demands must mutually exist between the same parties. *Dallas/Fort Worth Airport Bank v. Dallas Bank & Trust Co.*, 667 S.W.2d 572, 575 (Tex. App.—Dallas 1984, no writ) (citing *Western Shoe Co. v. Amarillo Nat'l Bank,* 94 S.W.2d 125, 128 (Tex. 1936)).

In *Conoco, Inc. v. Amarillo Nat'l Bank*, 14 S.W.3d 325 (Tex. App.—Amarillo 2000, no pet.), Conoco acted both as a supplier and a provider of credit card processing and collection services to Centergas, a wholesaler and retailer of petroleum products. Conoco set off the amount it owed Centergas for credit card sales against Centergas's debt to Conoco for the purchase of inventory. *Id*. at 327. As part of a loan agreement, Amarillo National Bank had taken a security interest in Centergas's accounts receivable, which was duly perfected and continued. *Id*. After Centergas filed for bankruptcy, the bank brought an action against Conoco, alleging conversion of accounts receivable in the form of the credit card proceeds that were part of the bank's collateral under the loan agreement with Centergas. *Id.* On appeal, the court held that the bank's suit was barred by the statute of limitations because the bank knew, or should have known, that Conoco had been offsetting accounts receivable against Centergas' debt. *Id*. at 329. The court did not question Conoco's ability to apply a setoff against Centergas' debt since the mutuality of obligations clearly

14

existed in this case: the demand Conoco had against Centergas for purchases of inventory matched, at the time of setoff, the demand Centergas has against Conoco for credit card receivables.

In contrast, the demand which Alon held against Akard in this case was not matched, at the time of setoff, by any demand Akard had against Alon. Vista, not Akard, had a right to receive a payment from Alon as a result of credit card purchases at Vista gas stations. Similarly, the debt related to fuel purchases constituted a right of Alon to receive a payment from Akard, not Vista. During the liability period, Vista never purchased fuel from Alon. All fuel purchases were made by Akard and the debt account reflected Akard's debt for these purchases, not Vista's. Consequently, Vista did not have a debt account with Alon capable of being setoff against Vista's right to receive payment from Alon, as Vista's credit card processing and collections provider, for credit card purchases at Vista gas stations.

It is undisputed that Vista created Akard as a separate entity in order to operate as a distributor and purchase gasoline tax-free, thereby taking advantage of the 2% statutory discount. Alon, however, never had a contract with Akard and was under no obligation to sell to Akard. Alon's contractual obligation was to sell gasoline to Vista. Because Vista is a dealer, not a distributor, Alon could only do so on a tax-paid basis. Alon would have incurred no liability if it had operated in this way, as established in its contract. However, Alon decided to treat Vista and Akard as separate entities for the purpose of selling gasoline tax-free to Akard but treat them as the same entity for purposes of the setoff. This approach is inherently inconsistent and setoff was inappropriate because there was no mutuality of obligations.

15

### (b) The Trust Fund Nature of the Funds

Additionally, setoff is not permitted if the funds involved are trust funds. *Citizens First Nat'l Bank of Tyler v. Cinco Exploration Co.*, 540 S.W.2d 292, 295 (Tex.1976); *Texas Mortgage Serv. Corp. v. Guadalupe Sav. & Loan Ass'n*, 761 F.2d 1068 (5th Cir. 1985)*; South Cent. Livestock Dealers, Inc. v. Security State Bank of Hedley,* 551 F.2d 1346, 1350-51 (5th Cir. 1977). In the context of financial transactions, it is settled that a bank with knowledge of the trust character of money deposited in an account cannot use the trust funds to offset the depositor's debt. *National Indem. Co. v. Spring Branch State Bank*, 348 S.W.2d 528, 529 (Tex. 1961); *First Nat'l Bank v. Arrow Oil & Gas, Inc.*, 818 S.W.2d 159, 161 (Tex. App.—Amarillo 1991, no writ)*; Security State Bank v. Valley Wide Elec.*, 752 S.W.2d 661, 665 (Tex. App.—Corpus Christi 1988, writ denied). In addition, it is the bank's duty to segregate the funds in a mixed account before applying any to overdrafts. *Security State Bank*, 752 S.W.2d at 665 (citing *Steere v. Stockyards Nat'l Bank*, 256 S.W. 586, 591 (Tex. 1923); *Allied Bank West Loop, N.A. v. C.B.D. & Assoc., Inc.*, 728 S.W.2d 49, 58 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *First Nat'l Bank v. Winkler*, 146 S.W.2d 201, 205 (Tex. Civ. App.—Austin 1940 ), *aff'd*, 161 S.W.2d 1053 (Tex.1942)); *City State Bank v. National Bank of Commerce*, 261 S.W.2d 749, 752 (Tex. Civ. App.—Fort Worth 1953, writ ref'd n.r.e.). If a bank knows that all or part of funds deposited with it may constitute trust funds and with such knowledge applies "the whole of such funds to the discharge of the depositor's debt to it, it thereby becomes a party to the misapplication thereof as against the fiduciaries, and can no longer assert immunity from liability for its wrongful act." *First Nat'l Bank of Schulenburg, Tex., v. Winkler*, 146 S.W.2d 201, 205 (Tex. Civ. App.—Austin 1940), *aff'd*, 161 S.W.2d 1053, 1942 (Tex.

1942); *Canyon Lake Bank v. New Braunfels Utils*, 638 S.W.2d 944, 947 (Tex. App.—Austin 1982, no writ).

In *U.S. Fidelity & Guaranty Co. v. Adoue & Lobit*, 137 S.W. 648, *aff'd on reh'g*, 138 S.W. 383 (Tex. 1911), the court declared that a bank receiving a deposit in the depositor's name as "guardian" had notice of the trust character of the funds, as a matter of law, and could not apply the trust funds to the depositor's individual indebtedness. *Adoue*, 137 S.W. at 652. In *Reed v. Valley Fed. Savs. & Loan Co.*, 655 S.W.2d 259 (Tex. App.—Corpus Christi 1983), the court, relying on *Adoue*, ruled that a certificate of deposit in the name of "[trustee's name], Minor, by [guardian's name], Guardian" placed the bank on notice of the trust character of the funds and the bank could neither apply the funds to repayment of the guardian's personal debt to the bank nor return the balance of the funds to the guardian individually without incurring liability. *Reed*, 655 S.W.2d at 263-64.

In the present case, Alon operated both as a fuel distributor and as a provider of credit card processing and collection services. This business structure placed Alon in the same position as the financial institutions in the cases above and made it subject to the same restrictions on setoff. Consequently, Alon should be liable if it acted with notice of the trust fund nature of the funds.

Alon had notice that it was dealing with funds that included taxes and therefore constituted trust funds. It knew that Fina, its predecessor in interest, sold to Vista on a tax-paid basis. It knew Vista operated gas stations and included the gasoline tax in the amount it charged consumers at the pump, whether they paid with cash or credit card. In addition, Alon's own contract with its credit card processor expressly states that the amount charged by the customer using its

17

credit card, the "aggregate charge slip amount," includes "all charges, delivery costs, applicable taxes and other fees." Alon itself directly owned 150 gas stations in West Texas and could not have been unaware of the imposition of gasoline tax on sales of gasoline in the state. As a result, Alon had notice that taxes were included in credit card transactions and thus had notice of the trust fund nature of the charges, especially since it also operated such a large number of gas stations of its own.

We overrule appellants' first issue.

## B. Evidence of the Actual Amount of Taxes Collected

In its second point of error, Alon argues that, even if it received a tax or money represented to be a tax, there is no evidence of the actual amount of such taxes as a matter of law. Alon claims the actual amount of gasoline taxes can be determined only by evidence of the amount of fuel sales by credit card at the Vista Stores and that such evidence does not exist.

### 1. Standard of Review

In reviewing the legal sufficiency of the evidence, we must consider all of the evidence in the light most favorable to the prevailing party and must indulge every reasonable inference in favor of the prevailing party. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). We will sustain a no-evidence point of error if: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or rule of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the only evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes

18

conclusively the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998).

### 2. *Sufficiency of the Evidence*

Alon provided Vista with point-of-sale systems and equipment that enabled Vista's customers to pay for purchases using credit cards. Alon alleges that, once a customer paid using a credit card, only the total amount charged for the sale was recorded and, thus, there is no record of how much of the sale constituted gasoline, gasoline taxes, items purchased at the convenience store, sales taxes, or other items. In other words, even though Alon was providing credit card processing services to gas stations and even though it knew that gasoline taxes were usually included in the total amount charged by customers on their credit cards at Vista gas stations, it chose to keep only a consolidated record of the total amount charged. In addition, even though it knew the funds collected from customers to pay for the purchases charged on credit card at Vista gas stations usually contained payment for the gasoline taxes, it chose to commingle those funds and apply them as a setoff to Akard's liability to Alon for fuel purchases. It now claims that, since there is no direct record indicating how much of the total amount charged by customers on their credit cards at Vista gas stations corresponded to gasoline taxes, there is no evidence of the amount of taxes collected by Alon.

However, a determination such as the one made by the State in this case is expressly authorized under section 111.008(a), which reads:

> If the comptroller is not satisfied with a tax report or the amount of tax required to be paid to the state by a person, the comptroller may compute and determine the

19

amount of tax to be paid from information contained in the report or from any other information available to the comptroller.

Tex. Tax Code Ann. § 111.008(a) (West 2002).

The Comptroller may determine or redetermine the amount of tax required to be paid by any person on the basis of any information within his possession. Texas Comptroller of Public Accounts, Decision No. 10,210 (1981). Where the person's own acts or failures cause the Comptroller to be without good or adequate information, then the Comptroller is justified in estimating the tax due on such information as is available. *Id.* Allowing parties to escape liability simply by alleging that no direct record of the taxes was kept would in fact discourage businesses from keeping appropriate records.

In other cases, the courts have approved various estimates and found them sufficient if the method used was reasonably calculated to reflect the taxes due. *United States v. Fior D'Italia*, 536 U.S. 238 (2002) (estimate of FICA tax liability for unreported tips determined by applying an average percentage tip to all sales); *Maganini v. Quinn*, 221 P.2d 241 (Cal. Ct. App. 1950) (total number of drinks sold, records kept on cash register tape, established price for each brand applied to inventory sold); *Fillichio v. Department of Revenue*, 155 N.E.2d 3 (Ill. 1958) (gross receipts determined according to best judgment and information); *W. T. Grant Co. v. Joseph*, 140 N.E.2d 244 (N.Y. 1957) (estimate of taxes on total number of sales where taxpayer had no record of individual sales).

Alon cites several cases where the evidence presented by the State was considered insufficient to establish the amount of taxes collected. *Herrera v. State*, No. 03-01-00101, 2002 Tex.

20

App. LEXIS 951 (Tex. App.—Austin, Feb. 7, 2002, no pet.) (not designated for publication); *Parker v. State*, 40 S.W.3d 555 (Tex. App.—Austin 2001, no pet.); *N.S. Sportswear, Inc. v. State*, 819 S.W.2d 230 (Tex. App.—Austin 1991, no writ). These cases are distinguishable because the State had relied solely on a certificate, assessment, or report issued by the Comptroller establishing the amount of taxes due, without any consideration of the amount actually collected from customers.[9]

In this case, the State did consider the amount of gasoline taxes Alon actually collected from customers and did not rely solely on the Comptroller's certificate showing how much gasoline tax Vista owed. The State obtained from Vista's accountants actual figures for, among other data, total sales and total cash sales. It then subtracted the amount of actual cash sales from the total sales to obtain the amount of credit card sales. These were actual sales figures from Vista's accounting records for the periods in question, not collection averages or estimates. The State then applied the percentage of credit card sales to the gallons of gasoline sold for each month to arrive at how many gallons of gasoline were purchased with credit cards each month. The percentage of credit card sales yielded by such calculation varied from a low of 21% for January 2001 to a high of 28% for December 2000. These figures are very conservative in contrast with other testimony at trial, including testimony from Vista's Chief Financial Officer, who testified that credit card sales made up 35-50% of Vista's revenue and gasoline sales amounted to 69% of revenues. Vista's

---

[9] These cases also consider whether the cash or accrual method was used. Such considerations are not applicable here because the data refer to amounts actually received by Alon and the method originally used by Vista or Akard to report its taxes is irrelevant. In addition, the gasoline tax was collected at the pump at the time of sale and the cash or accrual method is not applicable. *Ghashim v. State*, 104 S.W.3d 184, 187 (Tex. App.—Austin 2003, no pet.).

income statements for the period confirmed the figures provided by Vista's CFO.[10] The amount corresponding to the gasoline tax was calculated by applying the gasoline tax of 20 cents per gallon to the number of gallons purchased with credit cards each month. During discovery, Alon was able to introduce its own information regarding "chargebacks," amounts Alon did not actually collect because the credit card used was a stolen one, or there was some other mechanical problem in the credit process which prevented the cardholder's payment. The State deducted the chargebacks from the gasoline tax amount. The State thus relied not on the Comptroller's assessment, which amounted to over $4 million in taxes owed during the liability period, but instead produced a reasonable and conservative estimate placing the amount actually collected by Alon at about $919,000. This amount was calculated using actual sales figures for the period in question and deducting any amounts Alon alleged it could not collect from customers. There is sufficient evidence in the record to show that the State's method was reasonable and the amount of taxes collected was not excessive or arbitrary.

When an administrative body, charged with the duty of enforcing the tax laws, adopts a formula to determine the tax in situations such as this, the courts should presume the formula is

---

[10] Alon had previously received a copy of the same income statements presented at trial when it entered into negotiations to acquire an interest in Vista. By the last quarter of 2000, Vista was operating at a loss on both a net income and cash flow basis. There was already arrearage on the gasoline tax corresponding to the month of September 2000. Vista and Alon started negotiating a deal through which Vista would be restructured under a new entity, VistaDFWLocs, LLC, with Alon contributing $6 million to purchase a portion of the ownership of the new entity. Most of the money would go to pay down Vista's long term debt. In October 2000, Vista's president met with the CEO of Alon's parent company to discuss the plan. Vista followed through with its part of the deal by transferring its leasehold interest on the Fina branded gas stations to the new entity, VistaDFWLocs, LLC. Vista also assigned its interest in the Branded Contract to Akard. The deal needed to be done quickly because Vista was running out of money. Negotiations continued up until Vista's bankruptcy filing in June 2001. However, Alon never executed the transfer of Vista's leasehold interest or the assignment of the Branded Contract.

calculated to reach a reasonable result. *Smith v. State*, 418 S.W.2d 893, 896 (Tex. App.—Austin 1967, no writ). Where the tax cannot be determined with reasonable mathematical certainty from the available records, and the taxing authority declares the tax due from all information available that it deems reasonable, the burden to show that the determination was unreasonable, excessive, or that it was reached capriciously or arbitrarily, shifts to the complainant. *Id.* (citing *Smith v. State*, 391 P.2d 718, 728 (Wash. 1964)).

Once the State presented its estimate for the amount of taxes collected, Alon had the burden to show that the determination was unreasonable, excessive, or that it was reached capriciously or arbitrarily. *Smith*, 418 S.W.2d at 896. To overturn the amount established by the State, Alon was required to show by competent evidence that the estimate was arbitrary or illegal and that it was excessive. *City of Arlington v. Cannon*, 271 S.W.2d 414, 418 (Tex. 1954). The burden was also on Alon to show that the method or formula used by the State was fundamentally wrong and that its application substantially injured Alon. *State v. Whittenburg*, 265 S.W.2d 569, 573 (Tex. 1954). Proving merely that a tax was imposed is not sufficient to show a substantial injury; Alon must also show that the tax was unjust. *Smith*, 418 S.W.2d at 897.

After a careful review of the record, we conclude that Alon did not present any evidence challenging the State's assessment of tax liability. We overrule appellants' second issue.

## C. Reliability and Admissibility of Expert Testimony

In their third issue, appellants argue that the opinion testimony and report of the State's damages expert are unreliable and inadmissible as a matter of law and therefore are no evidence of damages.

### 1. Standard of Review

We review errors in the admissibility of expert testimony for an abuse of discretion. *Reliable Consultants, Inc. v. Jaquez*, 25 S.W.3d 336, 345 (Tex. App.—Austin 2000, pet. denied). A trial court abuses its discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We may reverse a trial court's judgment based on an error in the admission of evidence only if we conclude that (1) the trial court did in fact commit error and (2) the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

### 2. Expert Testimony

For an expert's testimony to be competent, it must be shown that he is trained in the science about which he testifies or has knowledge of the subject matter of the fact issue in question. *Reliable Consultants, Inc.*, 25 S.W.3d at 345. The undisputed evidence in the record shows that the State's expert witness, Comptroller Auditor Charles Hobbs, had at least 27 years of professional experience working as an auditor with the Comptroller, performing many gasoline tax audits involving convenience store gas stations. He audited major oil companies who, like Alon, issued their own credit card. He held a Master of Business Administration degree and had been a Certified Public Accountant for over 20 years. On the basis of these qualifications and using actual figures from Vista's accounting records, financial statements, and chargeback information provided by Alon, he calculated the tax Alon collected on credit card sales of gasoline at Vista gas stations.

24

Mr. Hobbs testimony was relevant and was even corroborated by other evidence on the record, such as the testimony from Vista's CFO. Thereafter, it was for the trier-of-fact to consider the expert testimony, along with all the other evidence, and to determine the ultimate issues of liability and damages. We find the State's expert testimony reliable considering his qualifications. In admitting it, the trial court did not act unreasonably or without regard to any guiding rules and principles. Having determined that the trial court did not abuse its discretion, we need not conduct a harm analysis. We overrule appellants' third issue.

## D. Liability as a Transferee

In their forth issue, appellants argue that, to the extent the trial court's decision was based on the analysis of Texas trust law in *In re Amber's Stores, Inc.*, 205 B.R. 828, 831 (Bankr. N.D. Tex. 1997), there is no "transfer" of trust property in the Fina card transactions and, accordingly, there can be no "wrongful transfer."

*Amber's Stores* is factually dissimilar to this case. In *Amber's Stores*, the stores gathered all their daily receipts and deposited them into an account. *In re Amber's Stores*, 205 B.R. at 830. All the funds in that account were transferred daily to a central account controlled by a bank, which then applied the funds towards Amber's Stores' debt. *Id.* Unlike the present case, the money paid by the customers to Amber's Stores was first put under the dominion and control of the store, which then deposited the funds into the bank account. As a result, the court in *Amber's Stores* properly characterized the bank as a transferee and not a statutory trustee for the purposes of section 111.016(a). *Id.* at 831.

In the present case, Vista never had a chance to exercise dominion and control over its credit card payments. Instead, Alon remained in control of the funds at all times and cannot be viewed as a transferee. Even when Vista demanded the approximately $919,000 held by Alon in excess of Akard's fuel debt as a deposit in an escrow account, it was necessary for Vista to obtain a temporary restraining order allowing Akard to draw fuel purchases against such funds. It is clear from the record that Alon never transferred dominion and control over the credit card payments for both the Fina cards and bank cards to either Vista or Akard. As a result, the trust funds remained in Alon's possession at all times and Alon is liable not as a transferee but, as shown in section A above, as a statutory trustee. We overrule appellants' forth issue.

Since Alon's fifth and sixth points of error are based on Alon's liability as a transferee, there is no need to reach these arguments because Alon is liable not as a transferee but as a statutory trustee.

Alon's seventh point of error, that the only month in which Alon even arguably had reason to believe Akard was not paying its gasoline tax was January 2001, is also based on Alon's liability as a transferee because it is only in the context of a transfer of trust funds that the transferee's knowledge that taxes were owed by the transferor at the moment of the transfer becomes relevant. In this case, Alon is liable as a statutory trustee and such knowledge is not required, as discussed in section A.3.b above.

## E. Cross-Appeal

In its cross-appeal, appellee argues that the trial court erred in not awarding judgment to the State and against Alon for the amount of tax, penalty, and interest due for September and

October 2000. Appellee bases its argument on three theories of liability: (1) statutory trustee liability pursuant to section 111.016 of the Texas Tax Code, (2) common law conversion, and (3) breach of fiduciary duty. Because we concluded, in section A above, that Alon is liable as a statutory trustee under section 111.016 of the Texas Tax Code, we agree that the trial court erred in not awarding judgment to the State for the months of September and October 2000. Accordingly, we sustain appellee's cross-point. We reverse the trial court judgment denying damages for September and October 2000. Having given the State all the relief requested in its cross-appeal, we need not reach the issues of whether Alon would also be liable under theories of common law conversion or breach of fiduciary duty.

### III.  CONCLUSION

We conclude that Alon is liable as a statutory trustee under Texas Tax Code section 111.016(a). The trial court improperly considered liability under section 111.016 to require notice that tax payments were outstanding. However, the plain language of section 111.016 creates a trust whenever anyone receives or collects a tax or money represented to be a tax and imposes no knowledge or notice requirement. Alon's application of Vista's credit card receipts as a setoff against Akard's fuel purchases is not a defense to tax liability because there was no mutuality of obligations and, more importantly, because Alon had notice of the trust fund nature of the funds. As the provider of credit card processing and collection services for Vista gas stations, Alon had notice of the trust fund nature of a portion of the credit card receipts it came to hold and inappropriately applied such trust funds as setoff. There was enough evidence for the State to accurately calculate the amount of taxes actually collected by Alon. The trial court did not abuse its

27

discretion in admitting the testimony of the State's expert. We, therefore, affirm that part of the trial court judgment awarding damages to the State for the months of December 2000 and January 2001, including interest, attorney's fees, and court costs. We reverse that part denying judgment for the months of September 2000 and October 2000 and, based on the findings of fact on the record, render judgment against Alon for the sum of $680,274.18 ($544,371.28 in Texas Gasoline Tax, $54,437.13 in penalties pursuant to section 111.061, and $81,465.77 in interest).

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed in Part; Reversed and Rendered in Part

Filed: May 26, 2005