# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00225-CV

**Great-West Life & Annuity Insurance Company, Appellant**

**v.**

**Texas Attorney General Child Support Division, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. D-1-GN-08-003506, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

When the winner of a Texas Lottery prize has incurred certain types of debts that are owed to or collected by the State and various other conditions are met, the Lottery Act (now chapter 466 of the Government Code) has always required the Lottery Commission to deduct and recoup the amounts of such debts from the prize payments that it would otherwise make to the winner. Since 1999, lottery winners have been permitted to voluntarily assign their rights to receive prize payments. The central issue in this appeal is whether the Lottery Act permits or requires the Lottery Commission to make deductions from prize payments to recoup a prize winner's debts in instances where the winner has assigned his rights to the payments before the statutory prerequisites for the deductions were ever met. We conclude that the Lottery Act does not authorize the deductions under those circumstances.

**BACKGROUND**

Because the underlying dispute centers on the construction and application of several provisions within the Lottery Act, it is helpful to first review those provisions before turning to the particular facts of this case.

**State-debt offsets**

Since the Lottery Act's 1991 inception, the Legislature has included mechanisms—termed "state debt" offsets or setoffs by the parties—through which the State can recoup from lottery prize winnings the amounts of certain debts that prize winners are obligated to pay the State. In a provision since codified as section 466.407 of the government code, the Legislature has required that the Lottery Commission (the agency charged with administering the state lottery) "shall deduct the amount of a delinquent tax or other money from the winnings of person who has been finally determined to be" delinquent or in default on state taxes, student loans, and certain other enumerated categories of state debts and "transfer the amount deducted to the appropriate agency." *See* Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 6, § 5.03(j), (k), 1991 Tex. Gen. Laws 197, 219, *codified as amended at* Tex. Gov't Code Ann. § 466.407(a), (b) (West 2004).[1] To the extent that "a person's winnings exceed a delinquency" deducted under the statute, the Commission "shall pay the balance to the person." *See* Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 6, § 5.03(k), 1991 Tex. Gen. Laws 197, 219, *codified as amended at* Tex. Gov't Code

---

[1] To be precise, the Lottery Act's state-debt offset requirements have been addressed to the Lottery Commission's director or executive director. Because the distinction is immaterial to our analysis, we will instead use "Lottery Commission" or "Commission" for clarity.

Ann. § 466.407(b). To facilitate enforcement of these requirements, the agencies and officials charged with collecting the types of state debts enumerated in section 466.407 have been required to provide the Commission "with a report of persons who have been finally determined to be delinquent in the payment of a tax or other money collected by the agency." *See* Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 6, § 5.03(l), 1991 Tex. Gen. Laws 197, 219, *codified as amended at* Tex. Gov't Code Ann. § 466.407(c) (West 2004).

Among the categories of state debts that can give rise to a deduction under section 466.407 have always been "delinquen[cies] in making child support payments administered or collected by the attorney general." *See* Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 6, § 5.03(j)(2), 1991 Tex. Gen. Laws 197, 219, *codified as amended at* Tex. Gov't Code Ann. § 466.407(a)(2). In 1997, the Legislature expanded the Act's state-debt recovery mechanisms to include tools for recovering unpaid child support in certain instances where the obligee is not receiving services from the attorney general. Among these expansions, it added a new section 466.4075 to the government code requiring that the Lottery Commission deduct from "a person's periodic installment winnings" an "amount that a court has ordered a person to pay as child support . . . if the executive director has been provided with a certified copy of a court order or writ of withholding issued under Chapter 158, Family Code, or notice of a child support lien created under Subchapter G, Chapter 157, Family Code." *See* Act of May 26, 1997, 75th Leg., R.S., ch. 1104, § 1, 1997 Tex. Gen. Laws 4240, 4240, *codified at* Tex. Gov't Code Ann. § 466.4075

(West 2004) (2nd version);[2] *see also* Tex. Fam. Code Ann. §§ 157.261, 158.501 (West 2010). In turn, the Commission "shall transfer the money deducted . . . to the clerk of the court that issued the order for placement in the registry of the court." Tex. Gov't Code Ann. § 466.4075(d). "If a person's winnings exceed the amount deducted" under section 466.4075 "and Section 466.407," the Commission "shall pay the balance to the person." *Id.*

**Assignment of lottery prizes**

When it first enacted the Lottery Act in 1991, the Legislature prohibited prize winners from assigning their rights to receive prize payments except pursuant to an "appropriate judicial order" that resolved a controversy involving the prize winner. *See* Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 6, § 5.03(g), 1991 Tex. Gen. Laws 197, 218, *codified as amended at* Tex. Gov't Code Ann. § 466.406 (West 2004); *see also Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, ___, 54 Tex. Sup. Ct. J. 17, No. 08-0523, 2010 Tex. LEXIS 690, at *2-4 (Tex. Oct. 1, 2010) (surveying history of Lottery Act's restrictions on assignment of prizes). In 1999, however, the Legislature amended the Lottery Act to create an exception to the original restrictions against assignment of prizes. Under a new section 466.410 of the government code, the

---

[2] The Legislature actually added two new sections 466.4075 in 1997. The other section 466.4075, which appears first in the government code, applies to prizes paid by the Commission in lump sums. Act of May 7, 1997, 75th Leg., R.S., ch. 135, § 1, 1997 Tex. Gen. Laws 279, 280, *codified at* Tex. Gov't Code Ann. § 466.4075 (West 2004) (1st version). It is similar to the second section 466.4075 to the extent that it requires the Lottery Commission to deduct "an amount a court has ordered to pay as delinquent from a person's winnings" if the Commission "has been provided with a certified copy of a court order and a notice of child support lien for delinquent child support created under Subchapter G, Chapter 157, Family Code." *See id.* Because the parties agree that only the second section 466.4075 is directly relevant to this case, our references above to "section 466.4075" refer solely to that one.

4

right to receive future installment prize payments could be voluntarily assigned if, among other requirements, the assignor and assignee satisfied a litany of notice and disclosure safeguards, the assignment was in writing, and a Travis County district judge approved the assignment in an order finding that the parties had complied with the section's requirements, detailing the future prize payments being assigned, and directing the Lottery Commission as to when and to whom it should pay the prize amounts. *See* Act of May 30, 1999, 76th Leg., R.S., ch. 1394, §§ 3, 6, 1999 Tex. Gen. Laws 4718, 4718-19, *codified at* Tex. Gov't Code Ann. §§ 466.406, .410 (West 2004). Once the court order was obtained, a certified copy was to be sent to the Lottery Commission, which was required to acknowledge receipt of the order and comply unless it provided the assignee and assignor written notice that it could not comply. *See* Tex. Gov't Code Ann. § 466.410(g).

In addition to these restrictions, section 466.410 explicitly prohibited assignment of "installment prize payments due within the final two years of the prize payment schedule." *See id.* § 466.410(a). Additionally, subsection (h) of section 466.410 provided that "[a]n assignment pursuant to court order may not include or cover payments or portions of payments that are subject to an offset provided by this chapter." *Id.* § 466.410(h). An "offset provided by this chapter," the parties agree, referred to the Lottery Act's state-debt offset requirements, including sections 466.407 and 466.4075.

During the same 1999 session in which it added section 466.410 to the Lottery Act, however, the Legislature also enacted amendments to the Texas U.C.C. that brought Texas Lottery winnings within the definition of "account" in article 9. *See* Act of May 17, 1999, 76th Leg., R.S., ch. 414, § 1.01, 1999 Tex. Gen. Laws 2639, 2640, *codified at* Tex. Bus. & Com. Code Ann.

§ 9.102(a)(2)(viii) (West 2010) ("account" under article 9 includes "winnings in a lottery or other game of chance operated or sponsored by a state").  Under article 9, "accounts" are assignable.  *See* Tex. Bus. & Com. Code Ann. § 9.406(a) (West 2010).  Litigation eventually arose concerning the conflict between the Lottery Act, which purported to restrict assignments of lottery prizes, and the amended U.C.C., which made lottery prizes assignable.  Ultimately, in 2010, while this appeal was pending, the Texas Supreme Court, affirming a 2008 judgment of this Court,[3] held that conflict-of-law provisions in the U.C.C. rendered ineffective Lottery Act provisions that purported to restrict assignment of Texas Lottery winnings.  *DeQueen*, 2010 Tex. LEXIS 690, at *21-22.

Although the Legislature cross-referenced the Lottery Act's state-debt offset requirements when adding the new section 466.410, subsection (h), in 1999, *see* Tex. Gov't Code Ann. § 466.410(h), it did not make any corresponding amendments to sections 410.407 or 466.4075 to address prize payments that were assigned to third parties—nor has it ever done so.

**Warren hits the jackpot and sells it**

In 1994, Leslie Warren won a Lotto Texas jackpot prize of $10,123,227, to be paid in annual installments of $506,000 in each September of the years 1994 through 2013.  In March 1998, Warren and his wife divorced.  The divorce decree, from the district court of Wise County, confirmed that the lottery winnings were Warren's separate property.  The decree also ordered Warren to pay child support (there were two minor children of the marriage, a nine year-old and a

---

[3] *Texas Lottery Comm'n v. First State Bank of DeQueen*, 254 S.W.3d 677 (Tex. App.—Austin 2008), *aff'd*, 325 S.W.3d 628, 54 Tex. Sup. Ct. J. 17, No. 08-0523, 2010 Tex. LEXIS 690 (Tex. Oct. 1, 2010).

fourteen month-old) in the amount of $2,250 per month, plus an annual payment of $10,000 by October 1 of each year between 1998 through 2007 to fund a trust account for the children.

In July 1999—shortly after gubernatorial approval of the 1999 amendments allowing assignment of Texas Lottery prizes but still several years before the *DeQueen* decisions—Warren executed a written assignment of his rights to future installment payments of his lottery prize that was structured to comply with the requirements of the newly enacted section 466.410. Warren agreed to assign his rights to receive the prize payment for years 2000-2011 (i.e., all but the last two years of his remaining annual installments) to Singer Asset Finance Company, L.L.C., contingent on obtaining the court order required by section 466.410, in exchange for a lump-sum payment of $3,400,000. Singer Asset Finance Company, in turn, assigned the rights in the twelve prize payments to an affiliate, Singer Collateral Trust IV. In January 2000, a Travis County district court signed an order approving the assignments to the Singer entities and reflecting compliance with section 466.410's other requirements. Among other components, the order included a finding that, as required by section 466.410, subsection (h), "[t]he assignment does not include or cover lottery prize installment payments or portions of payments that are subject to any offset provided for in Chapter 466, Government Code." *See* Tex. Gov't Code Ann. § 466.410(h). There is no dispute that, in fact, no state-debt offset under the Lottery Act existed against Warren as of the date of either the assignment agreement or the district court's subsequent order approving the assignment.

Based on this and other findings reflecting compliance with section 466.410's requirements, the district court ordered that "Singer Collateral Trust IV is designated as assignee of

7

$506,000.00 from each of Leslie D. Warren['s] next 12 lottery prize installment payments, less any taxes and/or other offsets or mandatory withholdings required by law," beginning September 15, 2000, and that the Lottery Commission should pay Singer Collateral Trust IV those amounts in accordance with a schedule that the court included in the order. The schedule reflects "Date of Payment" on September 15 of each year, "Gross Payment" of $506,000 each year, "Gross Assigned to Singer Collateral Trust IV" of $506,000 each year, and "Gross Unassigned by this Order" of zero each year.

The order was thereafter transmitted to the Lottery Commission, which accepted it and complied, making the September 2000 prize payment of $506,000 to Singer Collateral Trust IV rather than to Warren. Meanwhile, Singer Collateral Trust IV agreed to assign its rights in the remaining eleven prize payments it owned to Comet Financial Corporation, which in turn agreed to assign its rights to appellant Great-West Life & Annuity Insurance Company, all contingent on obtaining the court order required by section 466.410. In September 2000, after the Lottery Commission had paid the 2000 prize installment to Singer Collateral Trust IV, a Travis County district court signed an order approving the assignments of the eleven prize payments to Great-West and ordering the Lottery Commission to make those payments accordingly beginning on September 15, 2001. Like the earlier order approving the assignments to the Singer entities, the second order contained a finding that "[t]he assignment does not include or cover lottery prize installment payments or portions of payments that are subject to any offset provided for in Chapter 466, Government Code"—and, as with the earlier order, there is no contention that any such offsets existed at the time. The order also included identical language regarding the dates and

8

gross amounts of the prize payments, and indicated that the assigned annual prize payments were each in the amount of $506,000 "less any taxes and/or other offsets or mandatory withholdings required by law." This order was transmitted to the Lottery Commission, which again accepted it and complied, making the 2001 prize payment of $506,000 to Great-West. It did the same with the annual prize payments that came due during the years 2002 through 2007.

**The present dispute**

Meanwhile, there is no dispute (at least between the parties to this appeal) that Warren had ceased to make his annual $10,000 trust payments beginning in October 1999 and had begun failing to pay his $2,250 monthly child support in August 2004. In advance of the September 2008 lottery prize payment coming due, the attorney general's Child Support Division (the Division), appellee, issued and delivered to the Lottery Commission a notice of child support lien under family code chapter 157 and order of withholding under family code chapter 158. The Division asserted that Warren had become delinquent in paying his child support in the amount of $170,716.34 and ordered the Commission to withhold that amount from the upcoming prize payment. The right to receive that prize payment, again, had been assigned to Great-West eight years earlier.

The parties agree that the Division at this time "provided [the Lottery Commission] with a certified copy of a court order or a writ of withholding issued under Chapter 158, Family Code, or notice of a child support lien created under Subchapter G, Chapter 157, Family Code," as required for an offset under section 466.4075 of the Lottery Act. *See* Tex. Gov't Code Ann. § 466.4075. They also agree that this was the first time that the Division took actions

9

that would have met those statutory conditions. The parties likewise agree that Warren had by then been "finally determined" to be "delinquent in making child support payments administered or collected by the attorney general," as required for an offset under section 466.407. *See id.* § 466.407. However, they differ as to exactly when the "final determination" had occurred, with Great-West arguing that it occurred no earlier than August 2005 and the Division asserting that it occurred when it served the notice of lien and order on the Lottery Commission in 2008.[4] Either way, it is undisputed that neither the "final determination" of Warren's child-support delinquency required for an offset under section 466.407 nor the Division's provision of the lien, writ, or order required for an offset under section 466.4075 occurred until several years after Warren had assigned his rights to the prize payments and Great-West had acquired them.

Faced with conflicting demands to $170,716.34 of the $506,000 prize payment, the Lottery Commission paid the undisputed portion to Great-West, filed a petition in interpleader in Travis County district court as to the disputed amount, and tendered those funds into the court's registry. The Division and Great-West appeared, asserted competing claims to the interpleaded funds, and filed cross-motions for summary judgment on their respective claims. The

---

[4] Great-West points to an August 2005 order of the Wise County district court declaring Warren delinquent in paying child support as the first "final determination" of Warren's delinquency. The Division, in contrast, maintains that a "final determination" required to create an offset under section 466.407 instead means that a state agency seeking to collect a type of debt covered by the section advises the Lottery Commission of its "final determination" that the debt is owed. Consequently, the Division acknowledges that it first "finally determined Warren to be delinquent in his child support payments and reported this fact to the Lottery Commission by serving a notice of child support lien and administrative writ of withholding on the Commission on September 12, 2008." As indicated above, we need not decide which construction of "final determination" is correct because the material fact is that either "final determination" occurred after Warren had already assigned his rights in the prize payments.

10

central issue in dispute concerned whether the Lottery Act required or permitted the Lottery Commission to impose a state-debt offset against the 2008 prize payment to recoup Warren's unpaid child support where it was undisputed that no such offset could have existed until several years after Warren had assigned his rights to the payment.

In August 2009, while the cross-motions were still pending, the Division issued and delivered to the Lottery Commission a notice of child support lien and writ of withholding concerning the September 2009 annual prize payment. The Division asserted that Warren had become delinquent in paying child support by an additional $34,689.63 and ordered the Commission to withhold that amount from the upcoming payment to Great-West. The Lottery Commission paid Great-West the balance of the annual prize installment, filed a supplemental petition in interpleader and tendered the $34,689.63 in dispute into the court's registry. Great-West filed responsive pleadings. It also asserted conditional cross-claims against Warren seeking damages for breach of contract, breach of warranties, and indemnity in the event that Great-West should lose its right to receive the interpleaded funds.

Meanwhile, the district court heard the cross-motions for summary judgment on the claims regarding the 2008 annual prize payment. In November 2009, the district court signed an order granting the Division's motion and denying Great-West's. Subsequently, in February 2010, Great-West amended its answer and petition, moved to sever and abate its cross-claims against Warren, moved for summary judgment on its claims regarding the 2009 prize payment, moved for rehearing of the district court's order on the cross-motions concerning the 2008 prize payment, and

11

moved to stay disbursement of the 2008 funds. The Division then moved to disburse the 2009 funds, which the parties agreed to treat as a cross-motion for summary judgment.

The district court granted Great-West's motion to sever and abate its cross-claims against Warren and, subsequently, signed a final judgment denying all of Great-West's remaining motions, granting all of the Division's motions, awarding the 2008 and 2009 funds to the Division, and ordering them disbursed from the court's registry to the Division. Great-West then perfected this appeal. With its notice of appeal, Great-West sought an emergency stay of the district court's judgment, which this Court granted.

**ANALYSIS**

In two issues, Great-West argues that the district court erred in granting the Division's summary-judgment motion, denying Great-West's, and rendering judgment awarding the interpleaded portions of the 2008 and 2009 prize payments to the Division.[5] In its first issue, Great-West argues that the district court's rulings are predicated on an erroneous construction of the Lottery Act. Contrary to the district court's rulings, Great-West urges, the Lottery Act does not require or permit an offset against the prize payments to recoup Warren's unpaid child support where it is undisputed that Warren had assigned his rights in the payments several years before the offsets would have existed. Consequently, Great-West contends, it is entitled to the full amount of

---

[5] No disputes regarding the two remaining annual prize payments assigned to Great-West (2010 and 2011) or the final two payments (2012 and 2013) are presently before us. However, the parties have advised us that, as the 2010 payment came due, an interpleader proceeding was filed concerning the parties' respective rights to the payment. That proceeding, the parties further advise, has been abated pending the outcome of this appeal.

12

both prize payments as a matter of law. In the event we conclude that the district court correctly construed the Lottery Act, however, Great-West argues in its second issue that the offsets the Act creates are unenforceable because they violate the Texas Constitution's prohibitions against retroactive and ex post facto laws and result in an unconstitutional taking of Great-West's private property for public use without payment of just compensation. We need only address Great-West's first issue. *See* Tex. R. App. P. 47.1.

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215.

When, as here, parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary-judgment evidence supporting both motions and determine all questions presented. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We "should render the judgment that the trial court should have rendered." *Id.*

The parties agree that the district court's summary-judgment rulings rest principally on construction of the Lottery Act. Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective

13

in statutory construction is to give effect to the Legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437; *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See DeQueen*, 2010 Tex. LEXIS 690, at *13; *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws

14

on the same or similar subjects," "consequences of a particular construction," and the enactment's "title." *Id.* § 311.023(1)-(5), (7) (West 2005). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

The parties are also in agreement regarding some of the legal effects of the assignments at issue. There is no dispute that, through his assignment to the Singer entities, executed in 1999 and judicially approved in January 2000, Warren relinquished any legal or equitable interest in the 2000-2011 annual prize payment installments. *See* Tex. Bus. & Com. Code Ann. § 9.318(a) ("A debtor that has sold an account . . . does not retain a legal or equitable interest in the collateral sold").[6] Likewise, there is no dispute that once each assignment was effective and notification given to the Lottery Commission, the Commission could discharge its obligation to pay these assigned annual prize installments only by paying Singer Collateral Trust IV (as to the 2000 payment) and Great-West (as to the others), and could no longer do so by paying Warren. *See id.* § 9.406(a). Both parties also acknowledge the concept that an assignee "stands in the shoes" of its assignor and obtains whatever interest the assignor held at the time of assignment. *Thweat v. Jackson*, 838 S.W.2d 725, 727 (Tex. App.—Austin 1992) ("[It is axiomatic that an assignee . . . stands in the shoes of the assignor and obtains the right, title, and interest that the assignor had at the

---

[6] As previously indicated, and as both parties recognize, Texas Lottery prizes are "accounts" whose assignment is governed by article 9 of the U.C.C. *See* Tex. Bus. & Com. Code Ann. §§ 9.102(a)(2)(viii) ("account" includes state lottery winnings), .109(a)(3) (article 9 governs sale of accounts) (West 2010).

15

time of the assignment."), *aff'd*, 883 S.W.2d 171 (Tex. 1994). The parties part ways, however, as to how and when Warren's "shoes" should be determined.

Great-West argues that it stands in Warren's shoes "*at the time of the assignment*, and liens and offsets that arise subsequent to the assignment do not affect the right that [it] received." It emphasizes the general rule that an assignee is subject to claims and defenses against its assignor only if those claims and offsets accrued prior to the assignment, or at least before the obligor was notified of the assignment. *See* Tex. Bus. & Com. Code Ann. § 9.404(a)(2) (West 2002) (assignee's rights are subject to a "defense or claim of the account debtor [here, the Lottery Commission[7]] against the assignor that accrues *before* the account debtor receives a notification of the assignment authenticated by the assignor or the assignee") (emphasis added); *A.F. Vogt v. Jones*, 396 S.W.2d 539, 540 (Tex. Civ. App.—Fort Worth 1965, no writ) ("An assignee's right against the obligor is subject to all limitations of the obligee's right, to all absolute and temporary defenses thereto, and to all set-offs and counterclaims of the obligor which would have been available against the obligee had there been no assignment, *provided that such defenses and set-offs are based on facts existing at the time of assignment, or are based on facts arising thereafter prior to knowledge of the assignment by the obligor*.") (quoting Restatement of Contracts § 167 (1932)) (emphasis added). Because no offsets existed against Warren at the time of his assignment and the Lottery Commission's notification of it, Great-West reasons, its rights in the prize payments cannot, as a matter of law, be burdened by any offsets that purportedly came into existence years later to recoup Warren's unpaid child support.

---

[7] *See id.* § 9.102(a)(3) ("account debtor" is the "person obligated on the account").

In contrast, the Division has argued that under the Lottery Act—which, the parties agree, was incorporated into the agreement Warren entered into with the Lottery Commission when purchasing his winning Texas Lottery ticket[8]—"[t]he assignee (Great-West) stands in the shoes of [its] assignor (Warren) at the time each disbursement is made." *See* Tex. Bus. & Com. Code Ann. § 9.404(a)(1) (West 2002) (rights of an assignee are subject to "all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract"). The Division emphasizes that when Warren won his Texas Lottery jackpot prize, the Lottery Act entitled him to receive, with respect to each of the twenty annual installment prize payments, only the portion of the payment that exceeded any state-debt setoff that had accrued against him by the time that payment came due. *See* Tex. Gov't Code Ann. §§ 466.407(b), .4075(d). From this, the Division reasons, with respect to each of the future installment prize payments Warren assigned, he could convey only the right to receive whatever portion of that payment turned out to exceed any state-debt setoff to recoup his unpaid child support that had accrued by the time the payment came due. Consequently, in the Division's view, the Lottery Act "leaves the state in the same position that it would have been in had there been no assignment" with respect to its ability to recoup Warren's debts through state-debt offsets against the prize payments.

Great-West disputes that anything in the Lottery Act evidences legislative intent to depart from the general rule that assignees are not subject to claims against assignors that

---

[8] *See* Tex. Gov't Code Ann. § 466.252(a) (West 2004) ("By purchasing a ticket in a particular lottery game, a player agrees to abide by and be bound by the Commission's rules, including the rules applicable to the particular lottery game involved").

17

accrue post-assignment. It begins by questioning whether a state-debt offset to recoup Warren's unpaid child support could have arisen after Warren had assigned his rights in the prize payments against which the offset would be applied. Great-West urges that both section 466.407 and section 466.4075 plainly contemplate that a state-debt offset can arise only against a person who presently owns the right to the receive the prize payment against which the offset would be imposed. Section 466.407, Great-West observes, requires the Lottery Commission to "deduct the amount of a delinquent tax or other money *from the winnings of a person who has been finally determined to be* . . . delinquent in making child support payments administered or collected by the attorney general," and, "[i]f *a person's winnings* exceed a delinquency . . . pay the balance *to the person*." *See id.* § 466.407(a), (b) (emphases added). Similarly, Great-West points out, section 466.4075 requires deductions from "an amount a court has ordered *a person* to pay as child support from *a person's* periodic installment winnings . . . .," and, "[i]f *a person's winnings* exceed the amount deducted . . . pay the balance to *the person*." *See id.* § 466.4075(a), (d).

This language, Great-West argues, indicates that an offset can be imposed against a "person's winnings" only when the same person who owns the winnings is "finally determined" delinquent (under section 466.407) or is subject to a lien or withholding (under section 466.4075). And this is not surprising, Great-West asserts, because both section 466.407 and section 466.4075 date back to when voluntary assignments of lottery prizes were prohibited, and neither section was amended following the 1999 amendments that made prizes assignable. Further, to the extent that "winnings of a person" or "person's winnings" under sections 466.407 and 466.4075 could apply to an assignee who has acquired the original winner's right to receive the prize payments, Great-West

18

suggests that the provisions would create an offset only where *the same assignee* was "finally determined" delinquent or subject to a lien or withholding, not where, as here, the original prize winner was.

In response, the Division acknowledges that the Lottery Act contains "troublesome terminology" suggesting that an offset cannot arise from the delinquency of a prize winner who no longer owns the right to receive the prize payments. In particular, the Division concedes a "surface conflict between the term 'winnings of a person' in § 466.407(a) that gives rise to the state debt offset with the command to pay any excess 'to the person' in § 466.407(b)." But the Division insists that the Lottery Commission resolved any "problem with the terminology" by adopting the following definition of "Prize Winner" in its rule implementing section 466.410:

> "Prize Winner"—The name of the person who presented a valid ticket, claimed a lottery prize and was and is recognized by the Texas Lottery as the person entitled to receive the lottery prize payments and who is not an assignee of the lottery prize. In the event of any conflict between a person who presented a ticket and a person who is recognized by the Texas Lottery as the person entitled to receive the lottery prize payments, a "prize winner" is the person recognized by the Texas Lottery as the person entitled to receive lottery prize payments.

16 Tex. Admin. Code § 401.309(a) (2010) (Tex. Lottery Comm'n, Assignability of Prizes). The Division reasons that the definition's first sentence makes Warren the "person" who owns the "winnings" (or "prize winner") whose delinquency gives rise to an offset under section 466.407, subsection (a) because he is the person who presented a valid ticket, claimed a lottery prize, was recognized by the Commission as the person entitled to receive the prize payments, and he is not an assignee of the prize. At the same time, however, the Division acknowledges that Warren

19

cannot also be the "person" entitled to be paid the excess of the prize payment over the delinquency under section 466.407, subsection (b), because "Warren no longer holds any legal or equitable interest in the prize money." This raises a "conflict," in the Division's view, such that the meaning of "prize winner" is governed by the second sentence of the definition and becomes "the person recognized by the Texas Lottery as the person entitled to receive lottery prize payments." That "person," the Division asserts, is Great-West.

Great-West counters that the Division "misconstrues the Rule" because the definition's first sentence explicitly excludes assignees from the definition of "prize winner"—"the person who presented a valid ticket, claimed a lottery prize and was and is recognized by the Texas Lottery as the person entitled to receive the lottery prize payments *and who is not an assignee of the lottery prize*." *Id.* (emphasis added). Consistent with this distinction, Great-West adds, the Commission repeatedly contrasted "the prize winner" with "the assignee of the prize winner" throughout the remainder of the rule.[9] Read in this context, the definition's second sentence, in Great-West's view, addresses how the definition of "prize winner" prescribed in the preceding sentence (which, again, excludes assignees) is to be applied when one person "presented a ticket"

---

[9] *See* Tex. Admin. Code § 401.309(b) ("Prizes in the lottery are not assignable except: . . . (3) pursuant to an order under Texas Government Code, §466.410 obtained by *a prize winner or an assignee of a prize winner*"), (d) (court order approving assignment under section 466.410 must contain release and hold harmless agreement by "*prize winner or assignee of prize winner*" as to any claims against Lottery Commission), (e) ("before the Texas Lottery will complete the assignment process for specific installment payments . . . (1) The *prize winner or assignee of a prize winner* must submit to the Commission an original notarized affidavit executed by the *prize winner or assignee of the prize winner* providing an original Release and Indemnification Agreement" and "(2) The *prize winner or the assignee of a prize winner* must pay the Commission an administrative fee of $500.00 for each assignment.") (emphases added).

and a different person "is recognized by the Texas Lottery as the person entitled to receive the lottery prize payments."

We agree with Great-West's assessment that, on their face, sections 466.407 and 466.4075 plainly contemplate that a state-debt offset can arise only where the "person" whose delinquency or debt gives rise to the offset is the same "person" who presently owns the right to receive the prize payment to be offset. *See* Tex. Gov't Code Ann. §§ 466.407(a), (b), .4075(a), (d). We likewise agree that the Lottery Commission's "Prize Winner" definition in its rule implementing section 466.410 cannot support a departure from these statutory limitations. In addition to the internal flaws Great-West identifies in the Division's construction of the rule, which wholly ignores the context in which the second sentence of the definition appears,[10] we must reject any notion that the statutory phrases "deduct the amount of a delinquent tax or other money *from the winnings of a person who* has been finally determined to be . . . delinquent" (in section 466.407) or deductions from "an amount a court has ordered *a person* to pay as child support from *a person's* periodic installment winnings (in section 466.4075) leave room for one person to own the winnings and a different person's conduct to give rise to the offset. *See, e.g.*, *Texas Mut. Ins. Co. v. Vista Cmty. Med. Ctr., LLP*, 275 S.W.3d 538, 557 (Tex. App.—Austin 2008, no pet.) ("We cannot construe the rule in a manner that is inconsistent with the statute.").

---

[10] As with statutes, we must construe the language of agency rules in context, not isolation. *See State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002) (we consider statutory language in context, not in isolation); *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1990) ("We construe administrative rules, which have the same force as statutes, in the same manner as statutes.").

On the other hand, the Division relies more heavily on section 466.410, subsection (h)'s prohibition against assigning "payments or portions of payments that are *subject to any offset provided by this chapter*." Tex. Gov't Code Ann. § 466.410(h) (emphasis added). It urges that "*subject to any offset provided by this chapter*" means that Warren could not assign prize payment amounts that either already were or would later become "subject to" an offset to recoup Warren's state debts. In other words, the Legislature's intent in subsection (h), according to the Division, was to preserve the State's ability to impose state-debt offsets to recoup a prize winner's debts from prize payment regardless of whether the prize winner had previously assigned away his rights to receive those prize payments under the new section 466.410.

As a threshold matter, the parties agree that although *DeQueen* ultimately held that the Lottery Act's restrictions on assignments are rendered ineffective by the U.C.C., *see DeQueen*, 2010 Tex. LEXIS 690, at *21-22, subsection (h) remains relevant to our analysis here because Great-West did not preserve an argument based on this holding of *DeQueen* in its summary-judgment motion and because the assignments here purported to comply with subsection (h). Additionally, as the Division points out, both court orders approving the assignments explicitly excluded "taxes and/or other offsets or mandatory withholdings required by law," which would presumably include an offset, if any, imposed by a virtue of an unchallenged subsection (h).[11]

---

[11] The Division also emphasizes the district court's finding in each order that "[t]he Assignment does not include or cover lottery prize installment payments, or portions of payment that are subject to any offset provided for in Chapter 466, Government Code," which it characterizes as "excluding" payments or portions of prize payments that did not comply with section 466.410, subsection (h). Contrary to the Division's characterization of it, this was merely a *finding* that the assigned prize payments were *not* "subject to any offset provided for in Chapter 466, Government Code," i.e., that the assignments, as a factual matter, did not include any payment "subject to any

22

While subsection (h) remains relevant here, the Division's construction of it—which, as Great-West suggests, "requires an assignee to change shoes every time the assignor does after the assignment"—lacks support in the provision's text. For one, subsection (h) does not purport to independently create state-debt offsets, only to prohibit assignments of prize payment amounts that are "subject to *any offset provided by this chapter*." "[A]ny offset provided by this chapter" is a phrase cross-referencing or incorporating provisions found elsewhere in the Lottery Act—in this case, sections 466.407 and 466.4075. Those provisions, again, contemplate that state-debt offsets can arise only where the same person whose delinquency gives rise to the offset also owns the right to receive the prize payments. Similarly consistent with that limitation, as Great-West urges, is the Legislature's use of "offset" in subsection (h) to describe the deductions mandated by those provisions. An "offset," Great-West observes, denotes demands that mutually exist between the same parties,[12] not demands that accrue against a party years after that party ceased to own the reciprocal right to demand payment. Furthermore, it is significant that the Legislature used the present-tense "*subject to* any offset provided by this chapter" and not a future-tense or prospective version of the phrase (e.g., "will become subject to . . .," "potentially becomes subject to . . .") or one that otherwise purports to apply offsets to prize payments that have previously been assigned. In sum, we agree with Great-West that the prohibition in subsection (h) necessarily refers to a state-debt

---

offset" and thereby complied with section 466.410, subsection (h). Nevertheless, each order's exclusion of "offsets or mandatory withholdings required by law" would appear to include any contemplated by "any offset provided for in Chapter 466, Government Code," and would thereby have the same practical effect as the explicit exclusion the Division advocates.

[12] *See, e.g.*, *Alon USA LP v. State*, 222 S.W.3d 19, 29 (Tex. App.—Austin 2005, pet. denied); *see also Black's Law Dictionary* 1195 (9th ed. 2009).

offset that existed against the assignor at the time of assignment, not any that could somehow arise post-assignment to recoup the assignor's debts. We similarly echo Great-West's assessment that if the Legislature had actually intended such a dramatic departure from established principles governing assignments, it presumably would have said so more explicitly. *See Acker*, 790 S.W.2d at 301 (we presume that the Legislature was aware of the background law and acted with reference to it); *Shook*, 304 S.W.3d at 917 (we presume that the Legislature included or excluded statutory words deliberately and purposefully).

The Division suggests that our construction of section 466.410, subsection (h) yields an absurdity that the Legislature could not possibly have intended. It urges that "[i]f the state debt setoff had to have been perfected . . . prior to the date of the assignment," subsection (h) would be rendered "meaningless" because "[t]he amounts stated as assignment [in the order] would reflect any state debt setoff due to Warren's conduct that was perfected prior to the assignment" and any state-debt setoff that arose against an assignee thereafter "is already covered by the plain language of . . . §§ 466.407 and 466.4075." *See DeQueen*, 2010 Tex. LEXIS 690 at *20 ("Courts 'do not lightly presume that the Legislature may have done a useless act.'") (citations omitted). We first note that whether subsection (h) is rendered "meaningless" by our construction is arguably a moot point after *DeQueen*, which held that the U.C.C. explicitly rendered ineffective the Lottery Act's assignment restrictions. *See id.* at *21-22. But accepting subsection (h)'s effectiveness under the circumstances of this case, our construction would not deprive it of any purpose within the Lottery Act. Without subsection (h), prize payments encumbered by an existing state-debt offset could be assigned, albeit subject to the existing offset. *See* Tex. Bus. & Com. Code Ann. § 9.404(a)(2). In subsection (h),

24

the Legislature went further and prohibited the assignment outright. Our construction of the Lottery Act gives effect to this legislative intent.

The Division also insists that our construction of subsection (h) "essentially guts the state debt setoff program" by enabling prize winners to avoid that remedy by selling their prizes before becoming delinquent on state debts, leaving the State with only traditional (and, it suggests, less effective) creditor's remedies against them. The Legislature could never have intended this result when adding section 466.410, the Division urges, given the Legislature's willingness during its preceding session to expand the use of the remedy in collecting unpaid child support[13] and its longstanding concern with ensuring timely payment of child support. Finally, the Division argues more generally that we should favor a construction of the Lottery Act that places the risk of future state-debt defaults on sophisticated financial services firms like Great-West rather than the State or "Texas children" and that such firms are in a position to factor such risks into the discount rate they apply when purchasing lottery prizes paid in future installments.

In *DeQueen*, the Lottery Commission raised similar concerns that giving effect to the U.C.C.'s conflict-of-laws language to the exclusion of the Lottery Act's assignment restrictions "will inhibit the State's efforts to collect child support because the Lottery Act provisions requiring the Commission to deduct the amount of a child support lien before paying a prize to a child support obligor will also be rendered ineffective." *DeQueen*, 2010 Tex. LEXIS 690 at *27. The

---

[13] In addition to the 1997 amendments that we have previously summarized, the Division cites a bill analysis regarding the 1997 legislation that became section 466.4075. The bill analysis reflects that proponents touted that over $2.7 million in "delinquent child support, defaults on student loans, and back taxes" had been recovered through state-debt setoffs since 1991. House Research Organization, Bill Analysis, Tex. H.B. 2424, 75th Leg., R.S. (1997), at 2.

25

Texas Supreme Court's response to this argument also controls our disposition of the Division's arguments here:

> We agree that persons who owe child support should pay it. But when the language of a statute is clear, it is not the judicial prerogative to go behind or around that language through the guise of construing it to reach what the parties or we might believe is a better result.

*Id.* at *27-28.

And if there is an absurdity yielded by the parties' proposed constructions of the Lottery Act that would belie such intent by the Legislature, it would flow from the construction the Division advocates. Under the Division's view of section 466.410, subsection (h), a prize winner's assignment of the full amount of future installment prize payments could be considered lawful when made if there are no existing state-debt offsets at the time, yet would be retroactively deemed unlawful if, after the fact—perhaps years after the fact—it turned out that the prize winner became delinquent on a state debt. The practical and conceptual implications of such a construction would tend to preclude the very assignments that the Legislature plainly intended to permit in section 466.410. Although the Division seems to assume otherwise, we question how potential assignees could meaningfully quantify the risk that a given prize winner will, a decade or more into the future, default on state taxes, a student loan, or child support (with the latter calculation perhaps also requiring assessment of such probabilities as whether the prize winner will conceive one or more children for whom he ends up paying child support in the years ahead), such that a market would exist for those assignments. Leaving this aside, the Division's theory implies that *all* prize amounts assigned pursuant to section 466.410 would effectively be "subject to an

26

offset provided under this chapter"—and therefore, prohibited from assignment by virtue of subsection (h)—because all assignments would remain susceptible to retroactive application of state-debt offsets of conceivably any amount that could arise in the future. Such implications of the Division's proposed construction confirm that it is a far more dubious reflection of legislative intent than the one we have concluded is compelled by the statutory text.

Because it is undisputed that no state-debt offsets existed against Warren at the time he assigned his rights in the 2008 and 2009 prize payment installments, the Lottery Act does not create or allow the offsets the Division seeks to impose against those payments, now owned by Great-West, to recoup Warren's unpaid child support. We accordingly sustain Great-West's first issue.

## CONCLUSION

We reverse the district court's judgment granting the Division summary judgment on its claims to the interpleaded portions of the 2008 and 2009 prize payments and awarding those funds to the Division. We render judgment granting Great-West summary judgment on its claims to these interpleaded funds and award them to Great-West.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Rendered

Filed:   February 3, 2011

27