# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00708-CV

**Saeed Khan, Appellant**

v.

**The State of Texas; the City of Houston, Texas; and the Transit Authority of Houston, Texas, Appellees**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GV-06-002172, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The State of Texas, the City of Houston, Texas, and the Transit Authority of Houston, Texas (collectively, the State) brought this collection suit against Saeed Khan and his business, A-1 Foods, Inc., for unpaid sales taxes. After a bench trial, the trial court entered a judgment in favor of the State against A-1 and Khan. Khan appeals, challenging the amount of unpaid taxes and penalty assessed against A-1 and his individual responsibility for the taxes and penalty. For the reasons that follow, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Khan formed A-1 in 1999 and was its majority owner during the audit periods.[1] A-1 operated two convenience stores in Houston: the "El Chito" store on the west side of Houston and the "Diamond Food Mart" on the southeast side of Houston. Both stores sold standard convenience-store fare including beer, cigarettes, candy, and soft drinks. The Diamond Food Mart also sold gasoline. Beginning in 2001, the Audit Division of the State Comptroller's office (the Division) audited the stores to determine whether they had paid the proper amounts of sales taxes. The Division ultimately conducted two separate audits. The first concerned the period of July 1, 1999, through April 30, 2002, and the second concerned the period of May 1, 2002, through March 31, 2004.

Both audits employed estimating or sampling audit procedures. *See* Tex. Tax Code Ann. §§ 111.008(a), .0042(d) (comptroller may employ estimate or sampling audit procedures using "the best information available" if a taxpayer's records are "inadequate to reflect accurately the business operations of the taxpayer"), 151.025 (required records) (West 2008); *see also* 34 Tex. Admin. Code §§ 3.281(c)(1) (Comptroller of Public Accounts, Records Required; Information Required), 3.282 (k) (Comptroller of Public Accounts, Auditing Taxpayer Record) (West 2011). The audits revealed that A-1 had significantly underpaid its sales taxes.

As a result of the first audit, the comptroller determined that A-1 had underpaid its sales tax liability by $64,694.61, and that it was also liable for penalty and interest. A-1 contested

---

[1] Although the parties disagree on the exact percentage of A-1 stock that Khan owned, they agree that he owned at least sixty percent.

the results of the first audit in an administrative hearing. At the conclusion of the administrative hearing, the administrative law judge revised the tax deficiency to $63,388.92 and affirmed the audit report as revised. The administrative law judge also concluded that the Division had established by clear and convincing evidence that a fifty-percent penalty was warranted, given the sizable margin by which A-1 had underpaid its taxes and its explanation which lacked credibility. *See* Tex. Tax Code Ann. § 111.061(b)(1) (West 2008); *see also* Tex. Comp. Pub. Acc'ts, Hearing No. 102,242, 2010 Tex. Tax LEXIS 93, at *6-7 (Sept. 30, 2010); Tex. Comp. Pub. Acc'ts, Hearing No. 44,599, 2005 WL 3725421, at *6 (June 8, 2005); Tex. Comp. Pub. Acc'ts, Hearing Nos. 35,015, 35,314, 1996 WL 808012, at *7 (Dec. 5, 1996). On January 9, 2006, the comptroller adopted and approved the administrative law judge's decision, which decision became final on February 1, 2006. *See* Tex. Tax Code Ann. § 111.009 (West 2008).

The second audit concerned the period of May 1, 2002, through March 31, 2004, and the lead auditor sent audit notices to A-1's registered agent and to the master mailing address that the Division had on file for A-1, but she received no response. After working on the audit for nearly nine months without input from A-1, the auditor established contact with A-1 but did not obtain additional information from it to complete the audit. On July 1, 2005, the comptroller sent A-1 notice of her determination for A-1's estimated unpaid taxes from the second audit period of $163,521.66, plus penalty and interest. A-1 did not request a redetermination of its estimated liability, and the comptroller's determination as to the second audit became final. *See id.*

On October 25, 2006, the State sued A-1 and Khan to recover the unpaid taxes and penalties, attaching to the original petition the comptroller's certificate of sales and use tax

3

delinquency.  *See* Tex. Tax Code Ann. § 111.013 (West 2008).[2]  The State alleged that A-1 was liable as a permitted taxpayer and that Khan was personally responsible under the tax code for A-1's liabilities as a "responsible individual" and as a "joint tortfeasor in fraud."  *See id*. § 111.016(b) (West 2008) (detailing individual responsibility for unpaid sales taxes).[3]  No answer was filed on behalf of A-1, and an interlocutory default judgment was entered against A-1 on April 17, 2008.[4]  Khan specifically denied any personal liability pursuant to section 111.016(b) of the tax code.

The case was tried to the court in September 2009.  The State's witnesses were Emma Fuentes who was employed by the comptroller as a supervisor, Khan, and the State's attorney who testified on attorney's fees.  Khan's witnesses were Khan and Mohammed Yousuf, an accountant who assisted Khan with the first audit.  The exhibits admitted at trial included:  (i) the comptroller's decision from the first audit with the order of the comptroller attaching, approving, and adopting the proposed comptroller's decision by the administrative law judge, (ii) correspondence between the

---

[2]  Although the State attached the delinquency certificate to its petition, the State states in its briefing that it did not base its claim against Khan on the delinquency certificate.  *See N.S. Sportswear, Inc. v. State*, 819 S.W.2d 230, 233 (Tex. App.—Austin 1991, no writ) (individual's liability under section 111.016 limited to amount "actually collected" and State "must prove the actual amount . . . received or collected"); *see also Parker v. State*, 36 S.W.3d 616, 618 (Tex. App.—Austin 2000, no pet.).

[3]  We refer to the current version of section 111.016 of the tax code for convenience.  We note that section 111.016 was amended in 2007 by adding subsections (a-1) and (b-1), but we do not consider either subsection in our analysis.  *See* Act of June 15, 2007, 80th Leg., R.S., ch. 931, § 2, 2007 Tex. Gen. Laws 3187, 3187 (current version at Tex. Tax Code Ann. § 111.016 (West 2008)). For taxes imposed after June 15, 2007, subsection (a-1) provides in part that "[a] person is presumed to have received or collected a tax . . . for the purpose of this section if the person files, or causes to be filed, a tax return or report with the comptroller showing tax due."  *Id*.

[4]  The interlocutory default judgment specifically recited that the "material allegations are deemed admitted as to defendant A-1, and ordered A-1 Foods to pay attorney's fees, court costs and such sum of money as may be proven on the trial of this cause."

parties concerning both audits, (iii) A-1's income tax returns, (iv) the audit reports, (v) A-1's sales and tax use returns, and (vi) A-1's sales tax permit.

Fuentes testified concerning the audits, the methods and procedures that the comptroller utilized to determine the tax liabilities, and the documentary evidence. Fuentes testified that she did not believe that the first audit overstated the amount of tax that was "actually collected" because the assessment was only made for two products, beer and cigarettes, rather than all of the items in the stores subject to sales tax. It was her opinion, based upon her review of the documents, that the audit was "accurate and fair." She provided similar testimony on the second audit. She also testified concerning the calculation of the amount of the delinquent taxes through the date of trial, the information that a convenience store is required to maintain and provide for sales tax purposes, and what information A-1 actually provided. Based upon her review of the audits, it was her opinion that the assumptions made by the auditors were "conservative."

Khan testified that he personally formed A-1, signed its initial sales-tax permit application, and was an officer and director. He also testified that he had a partner named Javaid Ashraf who served as A-1's vice-president.[5] Khan testified that he owned sixty percent of A-1's stock, Ashraf owned thirty percent, and an employee named Riaz Ahmed owned ten percent. Khan testified that he did not know why A-1's federal income tax returns for 1999 through 2003 listed him as the sole owner of A-1 stock. Khan testified that he and Ashraf both signed checks on A-1's bank accounts, but he alone signed A-1's sales and use tax reports. Khan also testified that

---

[5] Khan was unable to provide an explanation as to why Ashraf's name never appeared in any of A-1's public information reports.

he relied on his employees to provide the sales information that went into A-1's tax reports, that he employed no accounting controls to verify the information they provided him, and that he did not keep track of whether his employees took money out of his stores' cash registers. Khan testified that Ahmed drew no formal salary but rather paid himself out of the cash register as money came into the store. Khan also testified that sometimes his employees would pay vendors directly out of the registers, so not all of A-1's purchases were reflected in its bank statements. Khan further testified that he sold his interest in the El Chito store in September 2002 and the Diamond Food Mart in January 2003. Khan, however, continued to sign sales and use tax reports for A-1. A-1 went out of business altogether by the end of the second audit period, at which time it had $30,000 on hand that Khan used to pay a bank towards a line of credit.

After hearing testimony from both sides, the trial court rendered judgment for the State and against A-1 and Khan jointly and severally. The court awarded the State a total of $489,110.87 in tax, penalties, and interest, plus $23,581.25 in attorney's fees. Upon request by A-1 and Khan, the court issued 73 findings of fact and 17 conclusions of law. Khan timely filed this appeal. A-1 did not appeal.

### STANDARD OF REVIEW

In an appeal from a bench trial, we review a trial court's conclusions of law de novo. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We review a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When findings of fact are filed and unchallenged, "they are binding on an appellate court unless the contrary is

6

established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

In a legal sufficiency challenge, we review the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain a legal sufficiency challenge if the record reveals: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id*. at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

For a factual sufficiency challenge, we must consider and weigh all the evidence in the record, both supporting and against the finding, to decide whether the finding should be set aside. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will set aside the judgment only if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id*.; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

**DISCUSSION**

Khan raises four issues on appeal. Khan challenges: (1) the information and the method that the State auditors used to calculate the sales tax A-1 owed; (2) the evidence to support the trial court's finding that he was individually responsible for A-1's unpaid taxes; (3) the

7

fifty percent (50%) penalty assessed against A-1; and (4) the evidence to support the trial court's finding that he was a responsible individual and that he willfully failed to pay collected sales tax to the State. We address each issue in turn.

### The Comptroller's Determination of A-1's Tax Liability

In his first issue, Khan challenges the trial court's conclusion of law that:

> Because of its failure to maintain records regarding both audits, the Comptroller was justified in estimating A-1 Foods's audit tax under section 111.008 of the tax code and authorized to employ an estimate and/or sampling audit procedure under section 111.0042(d) given that its most pertinent verifiable records—cash register tapes and complete purchase invoices—were unavailable for review.

Khan challenges the information and method that the Division used in performing its audits to determine A-1's tax liability.

When a taxpayer submits a tax report that the Division finds unsatisfactory, Division auditors may use "any . . . information available" to determine the taxes owed. Tex. Tax Code Ann. § 111.008(a). If the taxpayer's records "are inadequate to reflect accurately the business operations of the taxpayer," the auditor "shall determine the best information available and base his audit report on that information." *Id*. § 111.0042(d); 34 Tex. Admin. Code §§ 3.281(c)(1), .282(k). Auditors may use sampling audit methods if "the taxpayer's records are inadequate or insufficient, so that a competent audit for the [entire] period in question is not otherwise possible." Tex. Tax Code Ann. § 111.0042(b)(2); *see id*. §§ 111.008(a), .0042(d), 151.025; *see also* 34 Tex. Admin. Code §§ 3.281(c)(1), .282 (k). If an auditor uses sampling, the sample chosen must be as representative as possible of the entire audit period. Tex. Tax Code Ann. § 111.0042(d).

8

The trial court made the following findings of fact concerning the lack of information provided by A-1:

- [The auditor's] sole point of contact was M.R. Yousuf (Yousuf), an outside certified public accountant who represented A-1 Foods in connection with the first audit.

- [The auditor] requested that A-1 Foods provide cash register tapes, summary sales records, general ledgers, bank statements, food stamp records, check registers, purchase invoices, depreciation schedules, lottery information, and documentation of theft and pilferage.

- On January 2, 2002, [the auditor] notified A-1 Foods in writing (with a copy to Yousuf) that estimation procedures would be used to complete the first audit because the following records were missing: fixed asset listing/depreciation schedule, accounts receivable ledger, daily sales summaries, source documents (records of sales from all registers), exemption certificates, purchase invoices of inventory, records of food stamps sales, expense purchase invoices, and stock inventories.

- [The auditor] ultimately determined that the best information available was vendor records of A-1 Foods's beer and wine purchases. The auditor was able to obtain purchase records for certain periods from A-1 Foods's tobacco products supplier.

- A-1 Foods eventually provided the auditor with its bank statements for the entire first audit period. However, the auditor declined to amend the audit based on that information because there was no way to verify that all of its store receipts were deposited into the bank account in the absence of cash register tapes and summary sales records.

- A-1 Foods also provided [the auditor] with allegedly comprehensive invoices for beer purchases, but comparison of those invoices with summary records obtained from its beer distributors revealed that the invoices were incomplete so they were not used to amend the first audit.

- Regarding the second audit, A-1 Foods did not respond to the Audit Questionnaire nor cooperate in providing [the auditor] with records.

9

- Due to the lack of records from A-1 Foods, [the auditor] obtained the purchase information from [suppliers] to estimate the second audit.

The trial court also made detailed findings concerning the method the Division used to determine the amount owed based upon "the best information available." *See* Tex. Tax Code Ann. § 111.0042(d).

The evidence at trial included: (i) Fuentes's testimony concerning required documents that A-1 did not provide, (ii) documents showing the calculations and method employed by the Division to estimate the tax deficiencies, (iii) documents from the administrative proceeding as to the first audit, (iv) written correspondence between the parties as to both audits, and (v) the comptroller's final determinations of the tax deficiencies. Although Yousuf, Khan's accountant, provided contrary evidence concerning the documents A-1 provided during the audits and his opinion that the audits used incorrect assumptions and reached incorrect determinations of the unpaid taxes, the trial court reasonably could have disregarded his testimony and credited the State's testimonial and documentary evidence to find that A-1 did not provide the necessary documents during the audit period and to uphold the method employed by the auditors. *See City of Keller*, 168 S.W.3d at 807.

We conclude that the trial court did not err by concluding that the Comptroller was justified in estimating A-1 Foods's tax liability and authorized to employ an estimate and/or sampling audit procedure. *See* Tex. Tax Code Ann. §§ 111.008(a) & .0042(d), 151.025; *see also*

10

34 Tex. Admin. Code §§ 3.281(c)(1), 3.282(k); *BMC Software Belgium*, 83 SW.3d at 794. We overrule Khan's first issue.[6]

### The Amount of Unpaid Sales Tax "Actually Collected"

In his second issue, Khan argues that the trial court erred in finding him individually responsible under section 111.016 of the tax code for the payment of unpaid taxes because the "State did not prove a sufficient amount of tax was collected by A-1." *See* Tex. Tax Code Ann. § 111.016. For an individual to be held liable under section 111.016, this Court has held that the State has the burden to show the actual amount of taxes collected or received. *See Alon USA, LP v. State*, 222 S.W.3d 19, 32-33 (Tex. App.—Austin 2005, pet. denied); *Parker v. State*, 36 S.W.3d 616, 618 (Tex. App.—Austin 2000, no pet.); *N.S. Sportswear, Inc. v. State*, 819 S.W.2d 230, 233 (Tex. App.—Austin 1991, no writ). Khan then challenges the sufficiency of the evidence to support the amount of tax that A-1 actually collected or received during the audit periods.

The trial court found that A-1 collected a total of $226,910.58 in unreported sales tax during the audit periods.[7] The trial court made mirror findings of fact and conclusions of law concerning the actual collection of tax as follows:

- Regarding the first audit, A-1 Foods actually collected sales tax in the amount of $63,388.92.

---

[6] As part of this issue, Khan argues that the auditor made insufficient attempts to contact A-1 during the second audit before deciding to estimate unpaid taxes and that the auditor should have tried to obtain records from A-1 after establishing contact. The evidence, however, showed that the auditor made numerous attempts to contact A-1 during the second audit period.

[7] The remainder of the State's award consisted of interest and penalties.

- Regarding the second audit, A-1 Foods actually collected sales tax in the amount of $163,521.66.

Among its unchallenged findings, the trial court found that A-1 "charged and collected sales tax from its customers at the time of the purchase," and "Khan admitted the cash registers in both stores were programmed to include sales tax." *See Alon USA*, 222 S.W.3d at 33 n.9 (distinguishing cases where state's evidence found insufficient to establish amount of tax collected and noting difference between cash and accrual method of recording sales). These findings support the trial court's related findings and conclusions that A-1 actually collected the amount of unpaid tax assessed at the time of sale. *See McGalliard*, 722 S.W.2d at 696.

Fuentes's testimony further supports the trial court's findings and conclusions of law concerning the tax amounts "actually collected" by A-1. Fuentes testified as to the first audit:

Q. Now, do you believe that there's any possibility that the audit overstates the amount of tax that was actually collected at these two outlets during this first audit period?

A. No.

Q. And why do you believe that?

A. Because we only made the assessment for these two products that are subject to tax. Most people that walk into a convenience store need to pay tax on beer and cigarettes.

Fuentes's testimony was consistent with the documentary evidence from the audits that showed that the amounts assessed were based on only two of the types of products sold at the stores, and Fuentes

12

testified to other types of items that were subject to tax and not included in the assessments. She also testified that there were several "conservative" assumptions built into the audit.

As part of this issue, Khan contends that the evidence showed that A-1 actually reported $193,533.53 in sales tax during the audit periods, urging that its overall deficiency then was only approximately $33,377 ($226,910.58 minus $193,533.53). Khan interprets the $226,910.58 figure to represent the *total* amount of sales tax A-1 collected during the audit periods, including both the amounts that A-1 reported and did not report. In fact, it represents the amount of *unreported* sales tax A-1 collected during the audit periods. In other words, it represents A-1's tax *delinquency* and should not have been offset by the amount of taxes that A-1 actually reported. The court's findings of fact show that the tax deficiency only included unreported sales taxes:

- "A-1 Foods's *unreported* sales tax for the [first] audit period was $63,388.92"; and

- "For the second audit, A-1 Foods was assessed sales tax in the amount of $162,521 *in addition to* the $87,369 it reported."

(Emphasis added.) In other words, the $63,388.92 and $163,521.66 figures represent only the taxes that A-1 collected but did not report during the audit periods, so they should not have been offset by the $193,533.53 that A-1 did pay. We overrule Khan's second issue.

### The Fifty-Percent Penalty

In his third issue, Khan urges that the trial court incorrectly applied the law by upholding the fifty-percent penalties assessed against A-1 pursuant to section 111.061(b) of the tax code. Section 111.061(b) mandates a fifty-percent penalty on delinquent taxes "if it is determined

that . . . the failure to pay the tax . . . was a result of fraud or an intent to evade the tax." Tex. Tax Code Ann. § 111.061(b). Khan argues that "[i]n order to impose the penalty under § 111.061(b), there must be a finding that there was some conduct indicative of fraud or intent on the part of the taxpayer" and that the trial court did not make such a finding here. Khan, however, acknowledges the trial court's conclusion of law that:

> The court determines that a 50% fraud penalty assessed against A-1 Foods on both audits is warranted within the meaning of section 111.061(b) because it grossly under-reported its taxable sales to the State in excess of 25%.

Khan acknowledges that the Division uses a twenty-five-percent error rate as its threshold for pursuing penalties. *See, e.g.*, Tex. Comp. Pub. Acc'ts, Hearing No. 44,599, 2005 WL 3725421, at *6; Tex. Comp. Pub. Acc'ts, Hearing Nos. 35,015, 35,314, 1996 WL 808012, at *7. The Division has decided that "[g]ross underreporting, combined with no plausible explanation, [is] sufficient to meet the standard of clear and convincing evidence of intent to evade the tax." Tex. Comp. of Pub. Acc'ts, Hearing No. 44,599, 2005 WL 3725421, at *7. Logically, a high error rate makes it unlikely that underpayment is due to simple clerical mistakes or other excusable oversights, and we believe this is a reasonable interpretation of section 111.061(b) that does not contradict the plain language of the statute and is entitled to deference. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011) (administrative agency's "interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's

14

language"). Here, the evidence supports that A-1's underreporting exceeded twenty-five percent during both audit periods.

Moreover, the trial court reasonably could have credited the evidence that showed that the Division did not rely solely on A-1's error rate in seeking penalties. The State presented evidence that A-1 reported more sales to the IRS than it reported to the comptroller, and this evidence further supports a finding of intentional underpayment. We conclude that the trial court did not err in its application of the law by upholding the Division's assessment of penalties pursuant to section 111.061(b). *See* Tex. Tax Code Ann. § 111.061(b). We overrule Khan's third issue.

### *Khan's Liability as a "Responsible Individual"*

Finally, Khan argues that the trial court erred by finding him liable for A-1's unpaid taxes as a "responsible individual." Among its conclusions of law, the trial court concluded that Khan is a "responsible individual" within the meaning of section 111.016(b) of the tax code. Khan also challenges the conclusions of law made by the trial court that Khan willfully "failed to pay or cause the sales tax to be paid to the Comptroller as prescribed by section 111.016(b) because he had actual knowledge that taxes were due and paid other creditors with unencumbered funds" and "because he recklessly disregarded the risk that the sale tax was not paid and was in a position to find out with certainty very easily."

The tax code defines a "responsible individual" as

> an individual who controls or supervises the collection of tax or money from another person, or an individual who controls or supervises the accounting for and paying over of the tax or money, and who wilfully fails to pay or cause to be paid the tax or money.

15

*Id*. § 111.016(b). The tax code provides that "responsible individual" includes "an officer, manager, director, or employee of a corporation . . . who . . . is under a duty to perform an act with respect to the collection, accounting, or payment of a tax." *Id*. § 111.016(d). Responsible individuals are liable "for an amount equal to the tax or money not paid or caused to be paid." *Id*. § 111.016(b).

Among its unchallenged findings of fact, the trial court found that Khan signed the application for A-1's sales tax permit, sales tax returns and accompanying checks, the franchise tax report, and A-1's federal income tax returns and that he was the majority shareholder of A-1 during the audit periods. *See McGalliard*, 722 S.W.2d at 696. The evidence was consistent that Khan was A-1's president and majority, if not sole, shareholder during the audit periods, had the authority to, and did in fact, sign checks for A-1, and that he signed and filed A-1's tax returns. This evidence supports the trial court's findings and conclusion of law that Khan was a responsible individual within the plain meaning of section 111.016(b). *See* Tex. Tax Code Ann. § 111.016(b), (d); *Marks v. St. Luke's Episcopal Hosp*., 319 S.W.3d 658, 663 (Tex. 2010) (words in statute are "given their ordinary meaning unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results").

Khan also argues that even if he is a responsible individual for A-1, there was insufficient evidence that his failure to pay taxes was willful. Because section 111.016 is modeled on section 6672 of the Internal Revenue Code, 26 U.S.C. § 6672 (2002), we presume the legislature intended to adopt the federal courts' construction of the federal statute. *See State v. Crawford*, 262 S.W.3d 532, 538 (Tex. App.—Austin 2008, no pet.). Thus, this Court has held that willful conduct under the statute encompasses both actual knowledge of underpayment and reckless

16

disregard of the risk of underpayment. *See id*. at 544. That is to say, a responsible individual acts willfully if he had knowledge that taxes were due and paid other creditors nonetheless or "recklessly disregards the risk that the taxes may not be remitted to the government." *Id*. at 538 (quoting *Logal v. United States*, 195 F.3d 229, 232 (5th Cir. 1999)). The "reckless disregard" standard is met when a responsible person "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Id*. (quoting *Wright v. United States*, 809 F.2d 425, 427 (7th Cir. 1987)). Gross negligence is sufficient to establish reckless disregard. *Id*.

Among the trial court's unchallenged findings, the trial court found that "Khan admitted the cash registers in both outlets were programmed to include sales tax" but that he "merely estimated the amounts of sales tax reported to the Comptroller on A-1's sales tax returns for both audit periods," "A-1 never had a central accounting system or any accounting controls," and, despite learning of deficiencies in the first audit, Khan continued to estimate sales tax on A-1's sales tax returns and "failed to implement new accounting measures." *See McGalliard*, 722 S.W.2d at 696.

The evidence was consistent with the trial court's findings. A-1's own accountant testified that A-1 did not maintain the business records required by law and had no accounting system. Khan testified that (1) he signed A-1's sales and use tax returns without doing anything to verify that they had been prepared correctly; (2) A-1 had no accounting controls in place to ensure that its reported sales-tax amounts were accurate; and (3) his employees paid themselves and vendors directly out of A-1's cash registers. Given the trial court's unchallenged findings and this evidence, the trial court reasonably could have found that Khan should have known of the grave risk that A-1

17

was underpaying its taxes and that he was in a position to find out for certain very easily. *See Wright*, 809 F.2d at 427-28 (affirming trial court's determination that corporate secretary recklessly disregarded risk of tax delinquency because he could have easily checked corporation's books). Thus, sufficient evidence supports the trial court's conclusion that Khan recklessly disregarded the risk that A-1 was underpaying its taxes. This, in turn, is sufficient to establish that Khan's underpayment was willful and that Khan is therefore individually liable for A-1's unpaid taxes. *See Crawford*, 262 S.W.3d at 538. Given this conclusion, we need not address whether Khan underpaid A-1's taxes knowingly as opposed to merely recklessly. We overrule Khan's fourth issue.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed

Filed:   August 31, 2011

18